**CENTRAL GULF STEAMSHIP COR-
PORATION, Appellant,**

v.

**Basilio SAMBULA, Appellee.**

No. 25185.

United States Court of Appeals
Fifth Circuit.

Dec. 30, 1968.

Robert Gordon Gooch, Houston, Tex., for appellant, Baker, Botts, Shepherd & Coates, Houston Tex., of counsel.

John N. Barnhart, Houston, Tex., for appellee, Mandell & Wright, Houston, Tex., of counsel.

Before GOLDBERG and CLAYTON,* Circuit Judges, and HANNAY, District Judge.

GOLDBERG, Circuit Judge:

We begin with a crime on a street in Inchon, Korea. This Court's concern, however, is not with the criminal act itself, but with the medical consequences of that act and, more specifically, with the standard of care owed by a shipping company to a seaman injured while in its employ. Proceedings brought under the Jones Act[1] in the district court resulted in a judgment for the seaman and against the shipping company in the amount of $32,500. We affirm.

### I.

The district court's statement of facts, garrisoned by the clearly erroneous rule,[2] is so decisive and apposite that we merely rescribe it here. In January, 1964, Basilio Sambula, a seaman of some twenty years experience, was a messman in the service of the SS GREEN POINT, bound for Singapore. The SS GREEN

---

\* Judge Clayton did not participate in the decision of this case. The present opinion is rendered by a quorum of the court pursuant to 28 U.S.C.A. § 46.

1. 46 U.S.C.A. § 688. Recovery for injury to or death of seaman

Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.

2. Fed.R.Civ.Proc. 52(a): "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment * * *. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. * * *" See McAllister v. United States, 1954, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20, 24.

POINT is owned by the appellant, Gulf Steamship Company.

On January 12, 1964, at about 8:30 p. m., while on shore leave at Inchon, Korea, Sambula was attacked and robbed by three unidentified Korean hoodlums. During the affray, Sambula received a blow and cut in the area of his right eye. He was left unconscious in the street. After regaining consciousness, he began to look for help. Within a few minutes he found Yung Keun Choi, whom he recognized as having been a guest at the officers' mess aboard the SS GREEN POINT. Choi was president of the Oriental Marine Service Company, one of Central Gulf's Inchon agents.

When Choi saw Sambula, he noticed profuse bleeding from a cut beside the eye. This indicates that the condition of the eye itself was such that even a layman could have recognized the possibility of internal eye damage.

Choi took Sambula to the Kyonggi Hoosaing Public Hospital where Dr. Sung Hwi Lee, a Korean-trained general practitioner, examined and treated the eye. Neither Choi nor Dr. Lee could speak English. Sambula could not speak Korean.

When Dr. Lee first saw Sambula at about ten that evening, the area around the eye was swollen and bleeding. Dr. Lee's examination of the interior eye revealed bleeding, hyperemia of the retina, and "swelling" and "dark bluish" color on the periphery of the retina. Nevertheless, Dr. Lee concluded that "there were no dangerous symptoms." While the "vision of the right eye was a little weak," Sambula's right eye vision was essentially normal. Dr. Lee's treatment, which amounted to little more than first-aid, included wiping out the eye with boric acid sponges and normal saline, putting drops in the eye, administering a tranquilizer and an antibiotic injection, and bandaging the eye.

Dr. Lee, believing that Sambula had only light injuries, did not give any special instructions. He did, however, recommend that Sambula remain overnight in the hospital. The evidence is in conflict as to whether Choi took Sambula back to the ship or to a hotel room, but it is manifest that Sambula did not spend the night in a hospital bed.

The next day and the day after that, January 13 and 14, Dr. Lee again examined Sambula. Dr. Lee's testimony leaves no doubt that Sambula had vision in his right eye on both occasions.

At the time of Sambula's injury, there were at least two recognized specialists in the practice of ophthalmology residing in Inchon. No reason was given for not consulting one of these specialists. Furthermore, within thirty minutes drive from Inchon, the 121st U. S. Army Evacuation Hospital employed an ophthalmologist and had available complete eye diagnostic and treatment facilities. Not only were these facilities available for the treatment of American seamen; the custom was for such seamen to be taken there. The only reason given for preferring the Kyonggi Hoosaing Public Hospital was "because it is close."

Dr. Lee reported to the Captain that Sambula was fit to sail for Singapore if he were allowed to rest in his bunk. Although the ship had a hospital room, the Captain instructed Sambula to go down to his "fo'c'sle" and "to lay down and take it easy."

"Q. Now, did you have any special case? Were meals brought to you there in your fo'c'sle?

A. Oh, no. I have to go and get my own meals when I do feel like eating. Most of the time I couldn't eat. I was hurting so bad most of the time I didn't eat, but I didn't have no meals served. They didn't—we have a hospital on the ship. They didn't even put me in the hospital. I was in my room in my fo'c'sle.

Q. With three other men?

A. Three other men.

Q. What about bathrooming? Did you go and do your own toileting?

A. We don't have no toilet in no fo'c'sle. I have to walk and get out of the fo'c'sle to go to the toilet.

Q. By the way, were you having any constipation problems?

A. Way constipated. Way constipated because I notice the day— one day ·I have to do a lot of straining and believe that is the day that my eye started bleeding then and that evening the chief mate come up there to put some medicine in my eye. I could not see his hand then.

Q. That was the day you lost the vision?

A. That was the day I think I lost it.

Q. Do you know how long that was after you were at sea? Whether it was the first day or—

A. Yes. That is the second day. Two days. Two days later, I guess. Two days.

Q. In your fo'c'sle, you said that there were three other men? Did their activities allow you to have rest?

A. Couldn't have no rest with those guys. Those guys on that particular ship, they have a tape recorder. One guy had a tape recorder and he's over my bunk. I was under him and he played that tape recorder all the way to Singapore and I didn't have no— have no peace in that particular room with them, but I didn't say nothing about it because that is up to the ship to move me out of there. I didn't complain about nothing like that.

Q. Were there any other disturbing activities of the men in the room?

A. Well, yes. Because we had some guys there they gambles at night on that ship and they goes back and forth and run into the locker, bam, bam—the lockers, getting money out to go and gamble.

Q. What was your—what were. the facts about your comfort or lack of comfort?

A. Well, I didn't have no comfort at all after I got hurt. I believe I would have had better comfort in the hospital if I was moved to the hospital in the ship."

The general surroundings described above were, to say the least, not conducive to rest.

The mate and/or the Captain visited Sambula every day to check on his condition and to administer drops in his eye. This, however, was the extent of his medical attention during the voyage to Singapore.

When the voyage began, Sambula's eye was bandaged, but he had vision. Sambula testified that on the second or third day out he suffered a loss of vision in his right eye, suddenly and completely, accompanied by severe pain.

When the SS GREEN POINT arrived in Singapore on January 21, Sambula was taken immediately to Dr. Wong Kin Yip, an ophthalmologist, who recommended removal of the eye at the earliest possible date. Dr. Yip attributed the blindness to a ruptured globe caused by the initial blow on the eye, and suggested that Sambula should have been placed under the care of an ophthalmologist in Inchon.[3]

Sambula was flown at the ship's expense from Singapore to the United States. On February 4, the eye was removed at the Public Health Hospital

3. Dr. Yip further stated that in his opinion blindness would probably have resulted regardless of the kind and quality of treatment administered. The district court, however, chose to discredit this part of Dr. Yip's testimony because it conflicted with the opinion of another eye specialist and because the facts upon which Dr. Yip based his opinion were not introduced into evidence. We cannot say that the district court was clearly erroneous in this credibility determination.

in Galveston, Texas. The operation was successful. Sambula was fitted with an artificial eye and subsequently certified fit for duty as a messman.

The report of the post operative pathological examination of the eye confirmed the hypothesis of ruptured globe, more specifically at the equator superiorly and laterally. Blindness was caused by blood hemorrhaging through the rupture and separating the retina from the back wall of the eye. The eye cavity was filled with clotted blood.

Dr. Sylvan Brandon, an ophthalmologist who was the only medical expert to testify at the trial, concluded that in all medical probability blindness was caused by a secondary hemorrhage. The globe was ruptured by the blow to the eye. The initial rupture, however, clotted over and the retina was not destroyed at this time. As long as the clot remained in place, vision was not lost. Only when the clot broke loose several days later with the attendant hemorrhaging of blood into the eye cavity was the retina destroyed and vision irreparably lost. This was the secondary hemorrhage. The normal strain of getting up to eat and to go to the bathroom was sufficient to cause the clot to break loose. Therefore, the only proper medical treatment for a ruptured globe is complete bed rest under hospital care. Bed rest under other than hospital conditions would not, in Dr. Brandon's opinion be proper medical care. If Sambula had been given complete hospital bed rest, which was not available aboard the ship, the clot might have strengthened, the rupture might have healed, and blindness might have been avoided. Blindness was not inevitable at the time of the initial injury. Furthermore, in Dr. Brandon's opinion, a general practitioner is not qualified to treat an injury of this nature.

The district court's findings of fact concluded as follows, 268 F.Supp. 1:

"Dr. Lee's answers to interrogatories and medical reports show that he failed to diagnose correctly the injury to Sambula's eye. The crucial fact question with regard to Dr. Lee's conduct is therefore whether the symptoms apparent to Dr. Lee were sufficient to compel a proper diagnosis. According to Dr. Brandon they were. The swelling and dark bluish color on the periphery of the retina, according to Dr. Brandon, was the unmistakable key to a proper diagnosis of the ruptured globe. When that symptom was noted, proper medical care would dictate that Sambula be hospitalized immediately and the services of an expert opthalmologist secured. Contrary to the conclusion of Dr. Lee, the presence of the swelling and bluish color on the retina was a dangerous symptom of which proper account should have been taken. Dr. Lee's statement that he found no dangerous symptoms can only be taken as an admission that he failed to recognize what Dr. Brandon says is a clear danger signal.

"In summary, the globe of plaintiff's eye was ruptured by the blow he received in the street fight. Although injury to the eye itself was apparent, plaintiff was not taken to an eye specialist. Instead, he was taken to a general practitioner who failed to diagnose the rupture because he did not take proper account of the swelling and bluish color at the periphery of the retina. Having failed to make the proper diagnosis, that doctor of course failed to prescribe proper medical treatment. He also failed to consult ophthalmologists available in Inchon. Plaintiff was thus permitted to return to the ship and engage in a course of conduct which was calculated to cause the secondary hemorrhage. The secondary hemorrhage was the cause of blindness.

"As a result of the loss of his eye, plaintiff has experienced pain and suffering and great personal inconvenience in the conduct of his daily affairs."

The district court found that Dr. Lee was negligent in failing to properly diagnose and treat Sambula's eye and in failing to consult one of the eye special-

ists available in the vicinity of Inchon. This negligence was imputed to Central Gulf, the owner of the SS GREEN POINT. Using the following language, the district court also found the ship and its owner negligent in the selection of and continued reliance on Dr. Lee.

"Disregarding for the moment its liability for Dr. Lee's negligence, the ship was also guilty of negligence in its selection of Dr. Lee as the treating physician. Neither Dr. Lee nor the ship's agent could speak or understand English. Plaintiff could therefore not communicate his symptoms or understand any advice which may have been given. Moreover, the outward appearance of Sambula's eye should have put even a layman on notice that the services of an eye specialist were required. The fact that an ophthalmologist may not have been immediately available would not excuse the failure to consult one on the following day, or at some time before allowing Sambula to sail for Singapore.

"Sambula's eye was not irreparably lost for several days after the injury during the voyage to Singapore. He should have been hospitalized in Inchon as soon as possible. This was not done either because Dr. Lee failed to recognize the clear danger signal or because the ship's agent failed to provide a proper doctor. Either act was negligent and is imputed to the ship.

\* \* \* \* \* \*

"The blow to Sambula's eye placed in motion a chain of circumstances which would ultimately produce blindness unless some intervening act interrupted the sequence. By virtue of the guardian-ward relationship existing between ship owner and seaman, it was defendant's duty to intervene by providing proper medical care. This duty was breached. Certainly, at that point it was foreseeable that the breach of the duty to provide proper medical care would result in blindness.

\* \* \* \* \* \*

"In conclusion, defendant has committed negligent acts. Plaintiff's blindness was caused in whole or in part by such negligence. Plaintiff is therefore entitled to recover from defendant the sum of $32,500.00 as just compensation for the loss of his eye."

## II.

■ The district court correctly concluded that Sambula had a right to receive maintenance and cure from the SS GREEN POINT and its owners. The general rule is that a ship has a duty to provide maintenance and cure to any of its seamen injured while "in the service of the ship." This duty was articulated by the Supreme Court in The Osceola, 1902, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760, as follows:

"Upon a full review, however, of English and American authorities upon these questions, we think the law may be considered as settled upon the following propositions:

1. That the vessel and her owners are liable, in case a seaman falls sick, or is wounded, in the service of the ship, to the extent of his maintenance and cure, and to his wages, at least so long as the voyage is continued.

\* \* \* \* \* \*

4. That the seaman \* \* \* is entitled to maintenance and cure, whether the injuries were received by negligence or accident."

189 U.S. at 175, 23 S.Ct. at 487, 47 L.Ed. at 764.

■ In determining the meaning of the phrase "in the service of the ship," courts have noted that the lot of a seaman is an unusual one and that conventional concepts of scope and course of employment are not the norm of employer-employee relationships in maritime matters. Thus the Supreme Court has held that a seaman was "in the service of the ship" while enjoying his shore leave in a foreign port. In Aguilar v. Standard Oil Company, 1942, 318 U.S.

724, 63 S.Ct. 930, 87 L.Ed. 1107, we read:

"From the earliest times maritime nations have recognized that unique hazards, emphasized by unusual tenure and control, attend the work of seamen. The physical risks created by natural elements and the limitations of human adaptability to work at sea enlarge the narrower and more strictly occupational hazards of sailing and operating vessels. And the restrictions which accompany living aboard ship for long periods at a time combine with the constant shuttling between unfamiliar ports to deprive the seaman of the comforts and opportunities for leisure, essential for living and working, that accompany most land occupations. Furthermore, the seaman's unusual subjection to authority adds the weight of what would be involuntary servitude for others to these extraordinary hazards and limitations of ship life.

"Accordingly, with the combined object of encouraging marine commerce and assuring the well-being of seamen, maritime nations uniformly have imposed broad responsibilities for their health and safety upon the owners of ships.

\* \* \* \* \* \*

"Among the most pervasive incidents of the responsibility anciently imposed upon a shipowner for the health and security of sailors was liability for the maintenance and cure of seamen becoming ill or injured during the period of their service. In the United States this obligation has been recognized consistently as an implied provision in contracts of marine employment. Created thus with the contract of employment, the liability, unlike that for indemnity or that later created by the Jones Act, in no sense is predicated on the fault or negligence of the shipowner.

\* \* \* \* \* \*

"We think that the principles governing shipboard injuries apply to the facts presented by these cases. To relieve the shipowner of his obligation in the case of injuries incurred on shore leave would cast upon the seaman hazards encountered only by reason of the voyage. The assumption is hardly sound that the normal uses and purposes of shore leave are 'exclusively personal' and have no relation to the vessel's business. Men cannot live for long cooped up aboard ship without substantial impairment of their efficiency, if not also serious danger to discipline. Relaxation beyond the confines of the ship is necessary if the work is to go on, more so that it may move smoothly. No master would take a crew to sea if he could not grant shore leave, and no crew would be taken if it could never obtain it. Even more for the seaman than for the landsman, therefore, 'the superfluous is the necessary \* \* \* to make life livable' and to get work done. In short, shore leave is an elemental necessity in the sailing of ships, a part of the business as old as the art, not merely a personal diversion.

"The voyage creates not only the need for relaxation ashore, but the necessity that it be satisfied in distant and unfamiliar ports. If in those surroundings the seaman, without disqualifying misconduct, contracts disease or incurs injury, it is because of the voyage, the shipowner's business. That business has separated him from his usual places of association. By adding this separation to the restrictions of living as well as working aboard, it forges dual and unique compulsions for seeking relief wherever it may be found. In sum, it is the ship's business which subjects the seaman to the risks attending hours of relaxation in strange surroundings. Accordingly it is but reasonable that the business extend the same protections against injury from them as it gives for other risks of the employment." 318 U.S. at 727, 734, 63 S.Ct. at 936, 87 L.Ed. 1111–1115.

See also Warren v. United States, 1951, 340 U.S. 523, 71 S.Ct. 432, 95 L.Ed. 503, wherein the Supreme Court held that a seaman injured in a dance hall while on

shore leave was in the service of his ship.

■ The Jones Act gives a seaman a cause of action against his ship for the negligence of the master in the discharge of the ancient duty to provide maintenance and cure for wounds received while "in the course of his employment." 46 U.S.C.A. § 688; DeZon v. American President Lines, 1942, 318 U.S. 660, 665, 63 S.Ct. 814, 87 L.Ed. 1065, 1070; Cortes v. Baltimore Insular Line, 1932, 287 U.S. 367, 53 S.Ct. 173, 77 L.Ed. 368. In Nowery v. Smith, E.D. Pa.1946, 69 F.Supp. 755, aff'd 3 Cir. 1947, 161 F.2d 732, it was held that a seaman was "in the course of his employment," as that phrase is used in the Jones Act, while enjoying his shore leave in a foreign port. The court wrote:

> "Defendants urge that plaintiff cannot recover either damages under the Jones Act, or maintenance and cure, because his injuries were sustained while he was in a barroom on shore leave. The benefits of the Jones Act are extended to 'Any seaman who shall suffer personal injury in the course of his employment * * *"

> "In the instant case, what was the nature of plaintiff's 'service,' and what was its 'relationship to the operation of the vessel plying in navigable waters'? I suggest that an approach to the solution of that problem is found in Aguilar v. Standard Oil Co. of New Jersey, supra. In that case, the plaintiff was injured while crossing premises which he had to traverse on his way back to the vessel from shore leave, and the question presented was whether the shipowner was liable for maintenance and cure under those circumstances. The Supreme Court, in holding the shipowner liable, pointed out that shore leave, with its attendant relaxation, is a necessary and beneficial antidote for the confinement and rigid discipline to which the seaman is subjected aboard ship, by reason of the unique nature of his employment; and that it is the shipowner's business, and to his interest, to insure that the seaman shall enjoy these hours of relaxation whenever the opportunity presents itself.

> "I recognize that in the Aguilar case, and the companion case, Waterman Steamship Corp. v. Jones, the Supreme Court expressly limited its decision to the facts before it. However, in both of these cases, it seems to me that it was the occasion for the seaman's absence from the vessel —shore leave—which determined that he was on 'the shipowner's business' while he was on premises which had to be traversed in going from or returning to the vessel. That being so, I think that logic compels the conclusion that the seaman should also be considered on 'the shipowner's business' while he is actually enjoying his shore leave. And if, for the purpose of determining the shipowner's liability for maintenance and cure, the seaman is said to be on 'the shipowner's business' while on shore leave, I can see no valid reason why, for the purpose of determining the shipowner's liability under the Jones Act, the seaman should not be said to be 'in the course of his employment' at the same time. It is simply a question of defining the seaman's status; and I think that the concepts 'on the shipowner's business,' and 'in the course of employment,' as they are applied to the seafaring trade, comprehend identical factual situations."[4]

See Dangovich v. Isthmian Lines, Inc., S.D.N.Y.1963, 218 F.Supp. 235, 236, aff'd 2 Cir., 327 F.2d 355; Wheeler v. West India S.S. Co., S.D.N.Y.1951, 103 F.Supp. 631, 633, aff'd 2 Cir., 205 F.2d

---

4. The preceding language from Nowery v. Smith does not mean that a seaman may recover under the Jones Act for all injuries sustained while he is on shore leave; it means only that recovery cannot be denied solely on the ground that a seaman, while on shore leave, is not "in the course of his employment." Annot., 4 L.Ed.2d 1777, 1782 at fn. 5.

354, cert. den., 346 U.S. 889, 74 S.Ct. 141, 98 L.Ed. 393; cf. Braen v. Pfeifer Oil Transportation Company, 1959, 361 U.S. 129, 80 S.Ct. 247, 4 L.Ed.2d 191.

█ In conclusion, Sambula was "in the service of the ship" when he was injured, and consequently he had a right to receive maintenance and cure. Furthermore, if there was negligence in the ministration of maintenance and cure, he could recover damages under the Jones Act from the ship and its owners even though he was on shore leave when the injury and initial treatment occurred.

### III.

We now turn to the question of whether the SS GREEN POINT breached its duty to provide Sambula with adequate maintenance and cure. In particular, we focus upon two specific findings of negligence in the ministration of maintenance and cure by the SS GREEN POINT and its agents: (1) whether the ship was negligent in selecting and relying upon Dr. Lee, a general practitioner, instead of an opthalmologist; and (2) whether Dr. Lee was negligent in misdiagnosing the nature and extent of the injury to Sambula's eye and whether such negligence, if any, is chargeable to the ship and its owners.

*Selection and reliance on Dr. Lee.* Choi, an agent of the SS GREEN POINT found Sambula shortly after the affray in which Sambula's eye was injured and took him to the Kyonggi Hoosiang Public Hospital where Dr. Lee, a Korean-trained general practitioner examined and treated the eye. Neither Dr. Lee nor Choi could speak or understand English. Thus Sambula, who knew no Korean, could not communicate his symptoms or understand any advice which may have been given. Considering the combination of Dr. Lee's lack of special ophthalmological skills and the communication barrier, it is not surprising that the injury to Sambula's eye was misdiagnosed and mistreated.

The only reason advanced for taking Sambula to the Kyonggi Hoosiang Public Hospital in the first instance was "because it is close," and no plausible explanation was offered for the continued reliance on Dr. Lee in preference to the opthalmologists available in Inchon and at the nearby U. S. Army Evacuation Hospital where American seamen are customarily treated. In this context, the district court found negligence in the selection and continued reliance on Dr. Lee, and noted: "The fact that an opthalmologist may not have been immediately available would not excuse the failure to consult one on the following day, or at some time before allowing Sambula to sail for Singapore."

This finding of negligence is advanced as error by Central Gulf, the owner of the SS GREEN POINT, because, according to Central Gulf, such finding imposed by implication a two-fold duty upon ship captains administering to the maintenance and cure of wounded seamen in foreign ports: (1) a duty to select only English-speaking doctors who are specialists in the kind of treatment a wounded seaman requires; and (2) a duty to recognize when a wounded seaman needs treatment beyond that which a general practitioner can supply. Since we do not believe that this was the standard of care imposed by the district court, we do not need to pass upon its propriety. The grounds upon which we affirm the district court make such determination unnecessary.

We look to The Iroquois, 1903, 194 U. S. 240, 247, 24 S.Ct. 640, 643, 48 L.Ed. 955, 959, for an articulation and specification of the duty of the ship through its master for the medical care rights of a seaman:

> "The master was his legal guardian in the sense that it is a part of his duty to look out for the safety and care of his seamen, whether they make a distinct request for it or not."

Thirty-nine years later the Supreme Court in DeZon v. American President Lines, 1942, 318 U.S. 660, 63 S.Ct. 814, 87 L.Ed. 1065, reiterates and rearticu-

lates these duties and responsibilities in these words:

"The Circuit Court of Appeals in considering this case held that the shipowner's duty ended with the exercise of reasonable care to secure a competent general practitioner and since there could be no question that such care had been exercised, the shipowner could not be held liable in damages for harm that could have followed the negligence of the ship's doctor. In our opinion this was error.

\* \* \* \* \* \*

" 'The duty to .provide proper medical treatment and attendance for seamen falling ill or suffering injury in the service of the ship has been imposed upon the shipowners by all maritime nations.' The Iroquois, 194 U.S. 240–242, 24 S.Ct. 640, 48 L.Ed. 955–957. When the seaman becomes committed to the service of the ship the maritime law annexes a duty that no private agreement is competent to abrogate, and the ship is committed to the maintenance and cure of the seaman for illness or injury during the period of the voyage, and in some cases for a period thereafter. This duty does not depend upon fault. It is no merely formal obligation and it admits of no merely perfunctory discharge. Its measure depends upon the circumstances of each case—the seriousness of the injury or illness and the availability of aid. \* \* \* " 318 U.S. at 664–667, 63 S.Ct. at 817, 818, 87 L.Ed. at 1069–1071.

■ *The Iroquois* and *DeZon* instruct us that the ship, through its captain, has a duty to care for sick or injured crew members; and that this duty, whose measure varies with the circumstances of each case, admits of no perfunctory discharge. The duty is not to be conceived and executed in a vacuum. Rather, its operational dimensions have rational variables. The extent of the duty varies with the nature of the injury and the relative availability of .medical facilities. In some cases it may be enough to administer first aid without even calling a doctor. There are, however, cases at the other end of the spectrum where the duty is not satisfied by the calling of a competent general practitioner and where the failure to summon a specialist can be negligence.

In the long or not so long ago, depending upon one's age perspective, specialization in medicine was the exception and not the rule. Witchery and sorcery too were once putative curatives, and in another era blood was let to treat and cure all ailments. The black bag era of medicine, when one man comprehended all necessary knowledge of his day, is a bygone tradition. Today the treatment of diseases of the eye is a unitary discipline not generally committed to a doctor unschooled and untrained in its specialties. The human eye is irreplaceable and the duty in its therapy . should be congruent with that fact.

Having examined the master's duty in general terms, we proceed to the specifics of the case at bar. This is not a case where it was necessary to turn the ship around or make an arduous detour in order to have competent medical treatment and advice. See The Iroquois, 1903, 194 U.S. 240, 24 S.Ct. 640, 48 L.Ed. 955. The alternative peregrinations to a specialist and a hospital were short, involving no countervailing economic or nautical problems. There was no circling of the Cape of Good Hope for hospitalization and medical care, nor was there such arduousness as was endured by Stanley, the explorer, when he sought Dr. Livingston in darkest Africa. In Inchon there were two opthalmologists, and others were close by at the U. S. Army Evacuation Hospital.

■■ Circumstanced and injured as Sambula was, the accessibility of a hospital and the availability of an eye doctor are significant determinants of negligence. Here the ship not only relied solely upon a general practitioner because of convenience rather than because of the doctor's special skills, but it also chose to rely solely upon a man who could neither understand nor communicate with Sambula. The swelling and pro-

fuse bleeding around Sambula's eye, which is one of the more sensitive parts of the human body, was such that even a layman could have recognized the possibility of internal eye damage. The law does not require prognostic omniscience of the master, but it does impose upon him a duty to make reasonable efforts to secure the treatment leading most naturally to sight rather than blindness. If there was dubitancy, then caution would have indicated the wisdom of procuring a specialist and hospital care.[5] See The C. S. Holmes, 9 Cir. 1916, 237 F. 785.

 *Negligence of Dr. Lee.* The district court, on the basis of the facts detailed earlier, found that Dr. Lee was negligent in his misdiagnosis and mistreatment of Sambula's eye. After having carefully examined the evidence, we cannot say that the district court was clearly erroneous in these findings of negligence. See McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20.

We do not, of course, hold that Dr. Lee need have been omniscient, but we would have found, as did the district court, that Dr. Lee's treatment and diagnosis were inadequate to the occasion. As a consequence of our agreement with the district court, we find it unnecessary to involve ourselves in the farrago of opinions on whether negligence is a question of law or fact for the purpose of appellate review. We do, however, give consideration to the question of causation inasmuch as it gave the district court some concern. In the court below Central Gulf argued that Sambula could not recover unless he affirmatively showed that proper medical treatment would have, as a reasonable medical *probability,* prevented blindness. Assuming that Sambula's witnesses only testified that there was a *possibility* that sound opthalmological

regimen would have saved the eye, the evidence still would have been sufficient for the trier of fact to find that the negligent treatment led to blindness. There are judgmental elements of decision in a court's finding as in a jury's verdict and certitude in fact finding is like unto questing for the Holy Grail.

In Sentilles v. Inter-Caribbean Shipping Corp., 1959, 361 U.S. 107, 109–110, 80 S.Ct. 173, 175–176, 4 L.Ed.2d 142, 143–144, we read:

"The jury's power to draw the inference that the aggravation of petitioner's tubercular condition, evident so shortly after the accident, was in fact caused by that accident, was not impaired by the failure of any medical witness to testify that it was in fact the cause. Neither can it be impaired by the lack of medical unanimity as to the respective likelihood of the potential causes of the aggravation, or by the fact that other potential causes of the aggravation existed and were not conclusively negated by the proofs. The matter does not turn on the use of a particular form of words by the physicians in giving their testimony. The members of the jury, not the medical witnesses, were sworn to make a legal determination of the question of causation. They were entitled to take all the circumstances, including the medical testimony, into consideration. See Sullivan v. Boston Elevated R. Co., 185 Mass. 602, 71 N.E. 90; Miami Coal Co. v. Luce, 76 Ind.App. 245, 131 N.E. 824. Though this case involves a medical issue, it is no exception to the admonition that, 'It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain

---

5. We do not hold that in every case the ship has a duty to send sick or wounded seamen to specialists as these facts do not require us to go nearly that far in upholding the district court's finding of negligence. Nor are we so chauvinistic that we would say that seamen should be taken to American trained and American speaking doctors whenever possible. Whether a specialist is necessary depends upon the nature of the injury and the availability of special care. Each case is to be judged upon its own unique facts.

inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. * * * The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. * * * Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.' Tennant v. Peoria & P. U. R. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520, 15 NCCA NS 647. The proofs here justified with reason the conclusion of the jury that the accident caused the petitioner's serious subsequent illness. See Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493."

Cf. Rewis v. United States, 5 Cir. 1966, 369 F.2d 595, 599; Holliday v. Pacific Atlantic S. S. Co., 3 Cir. 1952, 197 F.2d 610, cert. den., 345 U.S. 922, 73 S.Ct. 780, 97 L.Ed. 1354.

■ We read the words of the *Sentilles* opinion as an uncompromising fiat. Thus we uphold the district court's finding that Sambula sustained his burden of showing that the negligence of Dr. Lee played a part in producing the injury for which damages are sought. See Rogers v. Missouri Pacific Ry. Co., 1957, 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed. 493, 499.[6]

We likewise affirm the district court's holding that Central Gulf was responsible for the negligence of Dr. Lee. Although Dr. Lee was an independent practitioner, his engagement by Central Gulf

in the discharge of its medical care duties to Sambula made him the agent of Central Gulf; and thus his deficient medical treatment, therapy, and prescription are attributable to Central Gulf on agency principles. Hopson v. Texaco, Inc., 1966, 383 U.S. 262, 86 S.Ct. 765, 15 L.Ed.2d 740. What was Dr. Lee if not the agent of Central Gulf? He was not engaged by Sambula; he was not a volunteer; and he was not a legal Martian. In such circumstances, it would tatter reality to say that there was no agency.[7] See Knox v. Ingalls Shipbuilding Corporation, 5 Cir., 1947, 158 F.2d 973.

The trial court was not only not clearly erroneous, it was clearly right. The judgment of the district court is

Affirmed.

6. The FELA standards are applicable to Jones Act cases by statutory mandate, 46 U.S.C.A. § 688. See Annot., 4 Ed.2d 1777, 1779.

7. In DeZon v. American President Lines, 1943, 318 U.S. 660, 668, 63 S.Ct. 814, 819, 87 L.Ed. 1065, 1071, wherein the Supreme Court held a ship liable for the negligence of a physician employed by the ship and carried on board, Justice Jackson wrote:

"We express no view as to the liability for malpractice by one not in the employ of the ship."
As we read the opinion, this language was used merely to limit the scope of the holding and was not intended to suggest a distinction between the responsibility of a ship for a physician in its regular employ and its responsibility for the negligence of an independent physician engaged to fulfill a singular duty to provide maintenance and cure.