**Raul BLANCO, Appellant,**

v.

**THE S.S. Michael TRACY, her boats, engines, tackle, apparel, etc., Harold L. Acey, a non-resident, individually, and as Master and M. & J. Tracy, Inc., foreign corporations or associations, as owners and/or operators of the S.S. Michael Tracy, Appellees.**

**No. 7976.**

United States Court of Appeals Fourth Circuit.

Argued Nov. 6, 1959.

Decided Nov. 16, 1959.

94

Burt M. Morewitz, Newport News, Va., for appellant.

John W. Winston, Norfolk, Va. (Seawell, McCoy, Winston & Dalton, Norfolk, Va., on the brief), for appellees.

Before SOBELOFF, Chief Judge, BOREMAN, Circuit Judge, and R. DORSEY WATKINS, District Judge.

R. DORSEY WATKINS, District Judge.

Appellant (Blanco) filed a libel against appellees to recover maintenance and cure for injuries received while on shore, and damages for the failure of the appellees to provide maintenance and cure. The district court rendered judgment adverse to appellant on both claims. The present appeal relates only to the right of Blanco to recover for maintenance and cure; the claim for damages has been abandoned.

Blanco was employed on the steamship Michael Tracy on October 26, 1954, at Newport News, Virginia, as an oiler. The vessel was engaged in the American coastwise coal trade, between Hampton Roads and ports to the north, a round voyage covering approximately seven days. The coastwise articles signed by Blanco expired on October 31, 1954. On November 1, 1954, and the first of each month thereafter, Blanco and the entire crew executed, to and including February 1, 1955, new coastwise articles each of which expired after one calendar month.

Blanco became involved in domestic difficulties and shortly after February 1, 1955, spoke to the Chief Engineer about securing a leave of absence. He was referred to the Captain, who gave him a "letter of absence of leave for two trips," or about fifteen days. On arrival of the vessel at Newport News on February 4, 1955, Blanco signed off the articles of the Michael Tracy, received his wages in full, and a Coast Guard discharge certificate prepared and signed by the Master.

Blanco for many years had been a member of the National Maritime Union (Union) which had a contract with The Collier Owners' Association (of which respondent M. & J. Tracy, Inc. was a member) dated June 16, 1953, as supplemented December 18, 1953, and as amended effective June 16, 1954 and in effect at all times relevant herein. Under this agreement M. & J. Tracy, Inc. (Tracy) agreed to procure all Unlicensed Personnel in the Engine Department

"through the employment offices of the Union, provided that the prospective employees are satisfactory to" Tracy. The Agreement further provided that Unlicensed Personnel might remain continuously employed on vessels operated by Tracy, provided they met certain preferential hiring requirements [1] and "provided further that" Tracy and the employees desire such employment to continue. The Agreement further provided that this section

"shall not be construed to prevent or postpone *reemployment* of employees who may be absent on account of illness, accidents in line with duty, vacations, or *leaves of absence*. The intent of this clause is that *leaves of absence shall be granted in writing when leaving the vessel* and shall not exceed a period of one round voyage or thirty (30) days, whichever may be the greater." (Emphasis supplied.)

Under the heading of "General Working Conditions" the Agreement provided for "vacation benefits" from three days in the case of 90 days service, to 14 days "in a spread of 360 consecutive days" and further provided that "if an employee has been in the continuous employ of one employer for three hundred sixty (360) consecutive days, he shall be entitled to an additional fourteen (14) days of vacation benefits. Continuous employment shall not be deemed to be broken by *leaves of absence* on account of illness, accidents, layoffs for lack of work, or *leaves of absence for valid reasons from service* on vessels operated by such employer; provided, however, that no vacation benefits shall accrue during such period of absence." (Emphasis supplied.)

The testimony was that under the "shipping rules" of the Union, if a member received a leave of absence up to thirty days, the Union would supply a substitute to the ship. If the member receiving such leave of absence reported to the Union within the stated time of the leave of absence, not in excess of thirty days, he would be referred to the ship by the employment office of the Union, and if accepted, he would "bump" the substitute. If the member did not report to the Union within the stated time, or within thirty days, he would lose his place on the Union register, and be placed at the bottom thereof.

Accordingly, on February 4, 1955, Blanco delivered his leave of absence letter from the master of the Michael Tracy, addressed to the Union, to the Union representative, and the Union supplied his replacement. On February 5, 1955, the Union representative gave Blanco a reshipping card that is issued to a member when he is entitled to reship after a leave of absence.

On February 7, 1955, Blanco fractured his leg while getting into his automobile at a drive-in, where he had gone with his wife for breakfast. On the same day he was admitted to a hospital where he remained until March 8, 1955. Thereafter he was treated in the United States Public Health Hospital in Norfolk, Virginia from July 12, 1955, intermittently until January 17, 1958.

When Blanco failed to return to the Michael Tracy at the end of the leave of absence granted him, his temporary replacement was discharged and the Union furnished a permanent replacement. Sometime thereafter the Union paid Blanco $31.31 for three days accrued vacation benefits from the Pension and Welfare Fund established from contributions by the Association.

When securing his leave of absence, Blanco left some of his gear on the

---

1. Preference was to be given to applicants who prior to June 15, 1948, had been employed on vessels of the Association under agreement with the Union and who were thereafter employed by members of the Association; next to applicants who since June 15, 1948 have been employed on vessels of the Association under agreement with the Union; and finally to applicants, who since June 15, 1948 have been employed on an American-flag vessel. The Union agreed to refer Unlicensed Personnel with due regard to "such preferences."

Michael Tracy, and for the purpose of this decision it may be assumed that at that time he intended to ask the Union employment office, at the end of two voyages (or not more than thirty days) to send him to the Michael Tracy for reemployment in place of the temporary replacement, that the Union would have done so, and that respondents would so have accepted him.

Blanco's counsel contends that his claim falls within the cases allowing maintenance and cure for injuries occurring while a seaman is on "shore leave"; citing many cases allowing maintenance and cure for shore leave injuries, including Smith v. United States, 4 Cir., 1948, 167 F.2d 550; Warren v. United States, 1951, 340 U.S. 523, 71 S.Ct. 432, 95 L.Ed. 503; Aguilar v. Standard Oil Co., 1943, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107; Farrell v. United States, 1949, 336 U.S. 511, 69 S.Ct. 707, 93 L. Ed. 850, and particularly German v. Carnegie-Illinois Steel Corporation, 3 Cir., 1948, 169 F.2d 715, and Hunt v. The Trawler Brighton, Inc., D.C.Mass.1952, 102 F.Supp. 300.

However, the "shore leave" cases are all instances in which there was found to be in existence a contract of employment at the time of the injury; see Calmar Steamship Corp. v. Taylor, 1938, 303 U.S. 525, 527, 58 S.Ct. 651, 82 L.Ed. 993; Cortes v. Baltimore Insular Line, Inc., 1932, 287 U.S. 367, 371–372, 53 S.Ct. 173, 77 L.Ed. 368; Aguilar v. Standard Oil Co., supra, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107. Most of the cases also refer to the injury having occurred while the seaman is in the service of the ship. Smith v. United States, 4 Cir., 1948, 167 F.2d 550, 551–552; Aguilar v. Standard Oil Co., supra, 318 U.S. 724, at pages 731–732, 63 S.Ct. 930, Farrell v. United States, supra, 336 U.S. 511, at page 516, 69 S.Ct. 707.

The cases most strongly relied upon by Blanco are clearly inapposite to the facts in this case. In German v. Carnegie-Illinois Steel Corp., 3 Cir., 1948, 169 F.2d 715, the plaintiff had been in the shipowner's employ continuously since 1937. He was regularly employed on a schedule of ten days on and five days off. On April 15, 1944 he received an injury on board ship, but continued working until May 5, 1944, when he went on the scheduled five-day shore leave. On May 8, 1944, he became unconscious from a cerebral thrombosis. The major points in controversy were whether this resulted from the April 15th accident, and as to the effect of a release executed by the claimant. In affirming the recovery, the court said (169 F.2d at page 718) "* * it is of paramount importance to note that the plaintiff was stricken while on *shore leave* on May 8, 1944. He thereupon became entitled to maintenance and cure * * *." (Emphasis supplied.)

In Hunt v. The Trawler Brighton, Inc., D.C.Mass.1952, 102 F.Supp. 300, the seaman had worked for several successive trips as deckhand on a fish trawler. The vessel regularly returned to the home port, discharged fish, and laid up for 48 hours before putting to sea again. Employment customarily continued unless the seaman advised the master to the contrary, or failed to show up for the next trip. However, the evidence was that seamen who had not indicated their intention not to continue in the employ of the vessel could during the 48-hour lay over be called upon to perform services, such as repairing nets, although this was not usually done. Between trips, Hunt broke a leg while ashore attending to personal affairs. He was granted maintenance and cure, on the ground that at the time he was "in the service of the ship in the sense of being generally answerable to the call of duty. * * *" (102 F.Supp. at page 301). The same judge, however, later had before him the claim for maintenance and cure by a seaman of a fishing vessel temporarily in port and undergoing repairs, who had helped unload the vessel and then took the next day off and went to the beach on pleasure, where he claimed that he became ill as the result of a previous shipboard injury. A jury verdict against him on claims for damage and maintenance and cure was rendered. The dis-

trict judge refused a tendered instruction that the plaintiff was entitled to maintenance and cure for illness or injury occurring ashore while the vessel was in her home port as long as the seaman had a "permanent site on the ship." On appeal, the court found no evidence that on the day of injury the seaman had been subject to call, saying (Keeping v. Dawson, 1 Cir., 1959, 262 F.2d 868, at page 871):

" * * * In fact the only testimony referring to June 1 was by the plaintiff to the effect that it was his *full day off*. Because of this lack of evidence relating to the character of the plaintiff's employment, there was nothing from which the jury could infer that the plaintiff was answerable to a call of duty on June 1. It would follow, therefore, that the plaintiff was not only not entitled to maintenance and cure as a matter of law but that he was also not entitled to an instruction that the jury could infer from the evidence that he was in the service of the ship on the evening of June 1, 1955." (Emphasis supplied.)

On the other hand, Blanco's counsel recognized Haskell v. Socony Mobil Oil Co., Inc., 1 Cir., 1956, 237 F.2d 707, as "dead against" the asserted right of Blanco to recover. In that case a seaman with four and one-half years of service on defendant's vessel sought and was granted ten days leave of absence to attend to personal business, on which he left the ship on December 4, 1952. At that time he had accumulated forty-six days of vacation under a union agreement with defendant. On December 5, 1952, he requested his full vacation leave, as of December 4, 1952, in lieu of leave of absence, which was granted. On December 9, 1952, he was hurt ashore while on personal business. Recovery of maintenance and cure was denied by the district judge on the distinction between "shore leave" traditional to maritime employment, and the leave in question. This was affirmed, the court on appeal expressly distinguishing German v. Carnegie-Illinois Steel Corp., supra, as follows (237 F.2d 710):

"The rationale of the cases cited does not seem to us to support the appellant's case. Shore leave consisting of brief periods ashore in home or foreign ports in the course of a voyage, or perhaps even before a voyage begins or after it has terminated, is, no doubt, a usual, traditional, and perhaps essential incident of a seaman's employment. Furthermore during such leave the seaman in a sense is in the service of his ship, for we suppose he could be called back on board, if he could be found, to cope with any shipboard emergency which might arise in port. But protracted vacations are not of 'elemental necessity in the sailing of ships, a part of the business as old as the art.' They are not traditional in maritime employment; they are the product of modern collective bargaining agreements now generally common in all employments both at sea and ashore. And during vacation periods we cannot assume that the seaman is answerable to the call of duty, and hence in a sense is "in the service of the ship.' "

In this connection might be noted McCall v. Overseas Tankship Corp., 2 Cir., 1955, 222 F.2d 441. There a seaman signed articles for a voyage from the United States to a port east of Suez, where he was to be signed off and replaced, and provided with return transportation, wages and maintenance until arrival at port of destination. The seaman signed off at Shanghai, received his discharge certificate, and settled his account. The vessel owner arranged airline passage for him to New York, on which flight he was killed. His estate sued the vessel owner under the Jones Act, 46 U.S.C.A. § 688, for his death in the course of his employment. An adverse verdict because of lack of employer-employee relationship was affirmed, the court saying (222 F.2d at page 443):

" * * * After McCall signed off at Shanghai, he was no longer in the employ of Overseas as a seaman. It is true that Overseas was under a contractual duty to 'arrange transportation' for his return to the United States and to pay him an amount equal to his wages for the time consumed enroute. But he was under no contractual duty to accept the offered transportation; he was at liberty to remain in Shanghai, to take other employment there, or to go wherever he pleased. After his return, had he arrived, he was free to work for whomever he might choose. Overseas had no right to his time or services and could give him no orders either in Shanghai or after he got home. The fact that he might later be reemployed as a seaman on another of Overseas' tankers does not make what he was doing in the meantime maritime employment. Hence the fatal airplane trip was not something done 'in the course of his employment' as a seaman. Even though both parties knew when he signed the shipping articles and when he signed off, that he expected to use the air transportation arranged by Overseas, his acceptance of it was something done at his own election and after his employment had ceased. * * * "

In this case Blanco had a right, under his membership in the Union, to have it tender him through the employment office to the ship for employment (or reemployment) if he so applied at the expiration of the second voyage (approximately fifteen days) or perhaps within thirty days, from the beginning of his leave of absence. Blanco was under no legal obligation so to apply; nor were respondents required to reemploy him if he was not "satisfactory."

From and after February 4, 1955 to and including the time of his inquiry on February 7, 1957, Blanco was not an employee of respondent; he was on a "leave of absence * * * from service",[2] obviously not subject to recall to service, particularly as the Union had furnished a replacement and the vessel on which he had been employed was to make two round trip voyages while he was ashore. Under these circumstances the district court was clearly right in holding that Blanco was not entitled to recover maintenance and cure for his injuries sustained on February 7, 1955; and the judgment of the district court is

Affirmed.

2. Union Agreement, Article II, Section 1(b).