**Thomas D. DAILEY**

v.

**ALCOA STEAMSHIP COMPANY, Inc.**

**No. 4751, Division "C".**

United States District Court
E. D. Louisiana,
New Orleans Division.

July 30, 1963.

John M. Holahan, New Orleans, La., for libelant.

William E. Wright and Maurie D. Yager, of Terriberry, Rault, Carroll, Yancey & Farrell, New Orleans, La., for respondent.

WEST, District Judge.

Libelant, a seaman, seeks to recover lost wages, maintenance and cure resulting from an accident in which he was involved on January 16, 1961. He contends that he was employed as a oiler aboard the S. S. ALCOA PLANTER, a vessel owned by respondent, and, at the time of his injury, was ashore on authorized shore leave. Respondent, on the other hand, contends that the libelant had gone ashore in violation of orders from the ship's officer in charge, and that furthermore, his accident and resulting injuries were caused by his own misconduct, including intoxication, at the time of the accident, and that therefore he is not entitled to recover wages, maintenance and cure resulting therefrom.

After trial of this case, and after hearing the evidence and arguments of counsel, it is the opinion of this Court that libelant is not entitled to recover wages, maintenance or cure from respondent, and in connection with this finding, the Court finds the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT.

1.

On January 16, 1961, libelant was assigned by his union, the Seafarers International Union, to report for work as an oiler aboard the S. S. ALCOA PLANTER, which, according to the shipping articles, was about to sail to "one or more ports in the Far East and/or Japan direct or via one or more U. S. Coastwise and/or intercoastal loading and/or discharging ports". This assignment was made about 10:00 o'clock a. m. on January 16, 1961.

2.

At about 11:00 o'clock a. m. libelant boarded the ship at the Poland Street

dock in New Orleans, Louisiana, to present his medical card to the Chief Engineer, Sam White. Mr. White instructed libelant to report to the Port Purser and present his personnel record, and then to go to the Customhouse in New Orleans, Louisiana, to be "signed on", and to return to the ship.

### 3.

At about 2:45 o'clock p. m. on January 16, 1961, libelant "signed on" at the Customhouse in New Orleans, Louisiana, and returned to the ship.

### 4.

Before reporting aboard the S. S. ALCOA PLANTER, libelant had at least three beers to drink.

### 5.

Upon returning to the ship in the middle of the afternoon on January 16, 1961, libelant reported to the First Assistant Engineer, Mr. James M. Cravey, presented his shipping card, and stated that he had been assigned to the ship as an oiler. He was asked by Mr. Cravey if he was ready to go to work, and he replied that he was not, as he did not have his gear aboard. Whereupon Mr. Cravey instructed him to get his gear so that he could "turn to". That was the last Mr. Cravey saw of libelant. Libelant denies this statement of the facts, claiming that his gear was already aboard and that Mr. Cravey just gave him the afternoon off and instructed him to report aboard for work the next morning. The Court was not at all impressed with the libelant's testimony, either in this regard or in regard to many other details of this accident, and simply believes that the testimony of Mr. Cravey is entitled to far more weight than that of libelant.

### 6.

Libelant, after his meeting with Mr. Cravey, left the ship, and while his testimony is not exactly clear, it appears that he went first to a barroom where he had at least two bottles of beer. He then went to his hotel, or rooming house, and later on, possibly around 11:00 o'clock p. m., he went to the Galley House Bar on Chartres Street in New Orleans, Louisiana, for the purpose, according to him, of returning a radio to a friend. However, it is interesting to note that he apparently remained at this barroom until somewhere around 1:30 o'clock in the morning.

### 7.

While at this bar libelant had one or two more bottles of beer, according to his testimony. At first he swore that he had had only a Coca Cola to drink while there, and then, under questioning, admitted that he had one beer, and then under further questioning, admitted that he had two beers, and how many he actually had will probably never be known. At any rate, for some reason or other, while at this bar he fell off of a bar stool and fractured his leg. His testimony as to how this happened is conflicting and confusing. At one point he testified that he was sitting on the stool when for some unknown reason he just fell over backwards off of it. At another time he testified that he was standing near the stool, and had been standing there for some time when he decided to sit on the stool, and that as he was placing one leg over the stool, he began coughing and fell over backwards. At still another time he testified that he momentarily lost consciousness, sort of blacked out, and just fell down and could not remember how it happened.

### 8.

Libelant has a long history of alcoholism. He testified that he probably had four or five drinks of whiskey a day, but he told the doctors at the hospital that he usually consumed about a half pint of whiskey a day. He further testified that he had "withdrawal troubles" when he did not have whiskey in the hospital. He was advised by the doctors at the hospital to "take it easy on that drinking". This Court concludes, as a matter of fact, that despite libelant's denials, he was intoxicated at the time of his accident and injury.

**9.**

This accident happened some time around 1:30 o'clock a. m., as the hospital record shows the time of admission following the accident as 2:00 o'clock a. m. on January 17, 1961. The evidence shows that an ambulance was dispatched from the U. S. Public Health Service Hospital immediately following the accident, and that no delay was encountered between the time of the accident and the admission of libelant to the United States Public Health Service Hospital.

**10.**

When libelant failed to return to work on the afternoon of January 16, 1961, in accordance with the instructions of the First Assistant Engineer, and then when he failed to show up at 8:00 o'clock a. m. the following day, the First Assistant Engineer called his company's office and requested a replacement.

**11.**

At the time libelant reported to the ship on the morning and afternoon of January 16, 1961, the ship was going through annual inspection and all hands aboard were busy and needed. When libelant was assigned to the PLANTER on January 16, 1961, he was entitled to pay for that day, and he was supposed to report aboard ready to immediately commence work. Thus, libelant was supposed to have been ready to turn to immediately upon reporting aboard on the afternoon of January 16, 1961.

**12.**

Libelant's failure to report aboard ready to work, and his failure to return to the ship ready to work after having been ordered by the First Assistant Engineer to bring his gear aboard and turn to were sufficient grounds for the termination of his employment with the ship had the officer in charge desired to follow this course. In effect, that is what was actually done on the morning of January 17, 1961, when libelant again failed to report for work.

**13.**

Libelant was not on leave from the duties aboard his ship at the time of his accident and injury, but instead was merely enjoying one last evening of drinking at one of his old haunts in New Orleans, Louisiana, prior to reporting to the ship for work.

**14.**

While there is little doubt that libelant sustained a rather severe injury, accompanied by complications during his period of treatment, nevertheless in view of the Court's decision on the question of liability, it is unnecessary to elaborate on the facts concerning the details of his injury.

CONCLUSIONS OF LAW.

**1.**

This case falls within the admiralty jurisdiction of this Court.

**2.**

█ It is too well settled to require citation of authority that the shipowner is liable for lost wages, maintenance and cure occasioned by injury or illness incurred by a seaman while in the service of his ship. As stated in Aguilar v. Standard Oil Co. of New Jersey, 318 U. S. 724, 63 S.Ct. 930, 87 L.Ed. 1107. "So broad is the shipowner's obligation, that negligence or acts short of culpable misconduct on the seaman's part will not relieve him of the responsibility."

**3.**

█ As further held in Aguilar, to relieve the shipowner of his obligation in the case of injuries incurred on shore leave would cast upon the seaman hazards encountered only by reason of the voyage. This holding was obviously based upon the premise that men can hardly be expected to live "cooped up" on a ship for long periods of time without occasional shore leave to break the monotony, and that therefore, such shore leave is as much a part of the service of the ship as is the work performed aboard. "In sum, it is the ship's business which

subjects the seaman to the risks attending hours of relaxation in strange surroundings." Aguilar v. Standard Oil Co. of New Jersey, supra.

### 4.

The reasoning of the Aguilar case, however, is not at all applicable to the present situation. Here there could be no conceivable connection between the service of the ship and the activities of libelant at the time of his injury. He was not on authorized shore leave at all. He was not on shore leave for the purpose of escaping for a time the monotony of the services aboard the ship during a voyage. He had performed no services of any kind aboard the ship, and in fact, in failing to report aboard the ship ready to work, as instructed by the officer in charge, he had violated the orders of his superior officer to the extent that discharge from employment therefore was in order at the discretion of his superior officer. Hence, under the circumstances of this case, the shipowner should be relieved of liability for injuries thus sustained by libelant while engaged in activities in no way whatsoever connected with the service of the ship, and in no way connected with shore leave as contemplated by the doctrine of the Aguilar case.

### 5.

 Willful misbehavior or deliberate acts of indiscretion suffice to deprive the seaman of his protection. The traditional instances are venereal disease and injuries received as a result of intoxication. When the seaman's injuries are caused by his intoxication, they are held to be occasioned by his misconduct, thus relieving the shipowner of the duty to provide maintenance and cure. Barlow v. Pan Atlantic Steamship Corp., 2 Cir., 101 F.2d 697; Bloomquist v. T. J. McCarthy S. S. Co., 7 Cir., 263 F.2d 590; Smith v. Isthmian Lines, Inc., D.C., 205 F.Supp. 954.

### 6.

 The injury suffered by libelant in this case was caused by his own misconduct, that is, while intoxicated, and while engaged in activities in no way whatsoever connected with the service of his ship, and thus, the respondent shipowner is thereby relieved of all liability for lost wages, maintenance and cure resulting therefrom.

Judgment will be rendered accordingly.