James J. SELLERS, Plaintiff-Appellant,

v.

DIXILYN CORPORATION, Defendant-Appellee.

No. 29255.

United States Court of Appeals,
Fifth Circuit.

Oct. 29, 1970.

Wilson M. Montero Jr., New Orleans, La., for appellant.

W. K. Christovich, New Orleans, La., for appellee.

Before BELL, THORNBERRY and CLARK, Circuit Judges.

PER CURIAM:

The facts in this non-jury admiralty suit seeking maintenance and cure, damages for failure to pay maintenance and cure, and attorney's fees are not in dispute. Therefore we have drawn heavily from the facts as recited in the district court opinion. That court held that although the plaintiff was a seaman, he did not show two additional requisite elements of maintenance and cure—(1) that he was on authorized shore leave and (2) he was answerable to the call of duty. Therefore recovery was denied. The absence of either of the two elements, which the district court found lacking, would preclude recovery. Since the undisputed facts as set out below establish the absence of both elements, we affirm the trial court.

James J. Sellers, the plaintiff-appellant, sustained injuries in an automobile accident on November 9, 1967, on Highway 71 between Bunkie and Alexandria, Louisiana while Sellers was en route from the drilling rig on which he worked in the Gulf of Mexico to his home in Colfax, Louisiana.

At the time that Sellers was injured he had been working as a roustabout for the defendant Dixilyn Corporation [Dixilyn] for about eleven months on its Rig No. 10, as offshore "jackup" mobile drilling platform located 50 or 60 miles from Grand Isle, Louisiana. His duties were concerned with the drilling operation itself, although on one or two occasions he did assist in the "jacking-up" of the rig preparatory to its being moved from one location to another, but he was never aboard the rig when it was being moved. The operations at the rig were under a schedule which required Sellers to be on the rig for seven days and allowed him to go shore for seven days. While on the rig he worked twelve hours and was off work for twelve hours. He ate and slept on the rig. Dixilyn had him transported from Grand Isle to the rig by boat (a trip of from five to seven hours) at the commencement of his working tour and back again at the end of it. He was paid by the hour for the time he worked on the rig, and was paid a stipulated amount for "boat time" for the boat trips to and from the rig. He received no pay for the seven days that he was off duty. Thus, his pay began and ended at the dock.

Duplicate separate crews took over all work on the rig during Sellers' time ashore. When each seven-day tour of duty on the rig ended, the two working crews then aboard the rig were, in effect, replaced in service by two other relieving crews for an equal period. This was a regularly scheduled work arrangement which allowed definite periods ashore and on the rig.

A seven day tour of duty ended for Sellers on November 8, 1967. The relief crew arrived at the rig about 1:00 or 2:00 P.M. and Sellers was returned to the dock at Grand Isle at about 6:30 or 7:00 o'clock that evening. He and co-worker, Huey Dubois, commenced the trip to Colfax in the latter's truck, stopping for gas and for food before Dubois, who is driving, struck a concrete

abutment at about 2:30 o'clock on the morning of November 9, some 250 miles north of Grand Isle.

According to the testimony adduced at the trial, Sellers had never been requested to return to duty during his off-duty time, but he vaguely remembered that some persons he could not identify had been called back on other rigs. He considered that he was free to fish, farm or make extra money at a service station during his time ashore. At oral argument, Sellers' attorney advised this court that although employees sometimes left a telephone number where they might be reached, Sellers had never done this.

Dubois and another of Sellers' coworkers testified that they had never been called back to work early. Dubois also testified that, if he were called and was not doing something else and wanted to make the time, he would go back. Dixilyn's drilling superintendent of twelve years experience testified that to his knowledge no one had ever been called back to duty during their off-duty time. He might recall workers in case of emergency, but whether they returned to duty or not would be their decision. Their off-duty time was their own to spend as they pleased, even to the extent of obtaining other employment during that time if they wished.

■ Sellers could not be said to be on authorized shore leave at the time of the accident. In fact, his "leave" or time off bore little resemblance to the shore leave of the traditional blue water seaman. The shore leave status found by the Supreme Court to exist in Aguilar v. Standard Oil Company of New Jersey, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1943), was held to arise from the demands placed upon this more customary type of maritime employee. This was a man who, as a necessary incident of irregular shipboard employment, was authorized to go ashore from time to time and place to place for diversion and relief from the routine of the ship. The court found that such a seaman as Aguilar was often more susceptible to contracting disease and incurring injury than were regular shore based employees because the conditions of the voyage put him ashore in distant and unfamiliar ports. The opinion also pointed out that not only did the shipowner's business separate such a seaman from his usual places of association, but also, since he was not replaced while he was ashore, he remained at all times subject to his shipping articles and recallable at the will of his master.

Not so for this off-shore worker in the oil industry. Sellers' employment was arranged into definite, equal periods on shore and on the rig. He was subjected to no foreign or irregular accommodations. Such a worker was to a large extent able to maintain the home life of ordinary shore dwellers. A separate crewman regularly replaced him and recall was not contemplated under any ordinary circumstances.

■ This brings us to the second requisite for the payment of maintenance and cure absent here—answerability to the call of duty; and we find that the trial court was also correct in concluding that the evidence did not sustain Sellers' claim that he was answerable to the call of duty at the time he was hurt. He had never been requested to return to duty during his several years of employment; nor did he even leave a telephone number with his employer where he might have been reached if needed. His superintendent pointed out that no such employee had ever been called back from off-duty time during the twelve years he had been with the company. The superintendent's testimony further indicates that although he might request a man such as Sellers to come back to work in the case of an emergency, whether he did return was purely discretionary on the man's part. The testimony of the individual employees supported this view of the employer-employee obligation. Sellers himself considered that he was free to pursue a second vocation or any avocation he desired. It is apparent from the facts adduced in this case that when Sellers was injured he was not

serving any direct or indirect interest of his employer.

The trial court properly found Sellers to be a seaman who was neither on authorized shore leave nor answerable to the call of duty. We therefore

Affirm.