**Thomas E. BAKER, Plaintiff-Appellant,**

v.

**OCEAN SYSTEMS, INC., Defendant-Appellee.**

No. 71–1953.

United States Court of Appeals,
Fifth Circuit.

Jan. 24, 1972.

Rehearing Denied Feb. 14, 1972.

Stanwood R. Duval, Jr., Duval, Arceneaux & Lewis, Houma, La., for plaintiff-appellant.

O'Neal, Henderson, Hanemann & Morris, Philip E. Henderson, Houma, La., for defendant-appellee.

Before BELL, AINSWORTH and GODBOLD, Circuit Judges.

---

7. Record at 57, 58.

AINSWORTH, Circuit Judge:

Thomas E. Baker filed this complaint in admiralty, seeking maintenance and cure under the general maritime law from Ocean Systems, Inc. On August 12, 1968, Baker was struck on the head with a pool cue wielded by Mark J. Ratcliff in the Cross Roads Lounge located on U. S. Highway 90 between Amelia, Louisiana, and Houma, Louisiana, about 7 miles from Morgan City, Louisiana. As a result of the unprovoked attack and consequent injury, plaintiff incurred medical expenses totaling $7,094.74. He spent 43 days as an in-patient in a hospital and an additional 218 days until he reached the maximum cure.

Baker had been employed by Ocean Systems as a marine diver-tender. He claimed that on the date of the accident he was employed as a seaman by Ocean and that he had been employed as such for more than a one-year period. He alleged that the vessel WESTERN EXPLORER was owned, chartered, or operated by defendant and was docked in the Port of Morgan City, Louisiana. He claimed that while in the service of the vessel as a seaman, he came ashore, informed his answering service of his general whereabouts, and all the while remained in the service of the WESTERN EXPLORER (or of any other ship owned, chartered, or operated by defendant while he was ashore). The defendant denied that plaintiff was employed by it on the date of the accident, but admitted that he had been employed intermittently by it off and on during a period in excess of one year prior to August 12, 1968. Ocean denied that Baker had been employed by it as a seaman, and further denied that it ever owned, chartered, or operated the WESTERN EXPLORER or that the vessel had been docked in the Port of Morgan City, Louisiana, on August 12, 1968. Ocean Systems acknowledged that Baker had been employed by it during the period of July 28, 1968, through August 11, 1968, and that during that period of time he had certain duties aboard the WESTERN EXPLORER, but averred that this was the only time that Baker had any duties whatsoever aboard that vessel while in its employ. Moreover, Ocean maintained that the injury to Baker did not arise out of his employment as a seaman, even assuming he was a seaman, and did not occur while plaintiff was in the service of any ship.

After a trial on the merits, the District Judge entered judgment for Ocean Systems denying the claim for maintenance and cure. The Court found that Baker was a seaman within the meaning of Offshore Company v. Robison, 5 Cir., 1959, 266 F.2d 769, in that he was more or less permanently attached to a vessel and his work contributed to the mission, purpose or function of that vessel, or to its welfare in terms of its maintenance while in navigable waters. However, the Court found "that the plaintiff had just completed a tour of duty for his employer, on one of the vessels operated by his employer, in the course of its business. The job which the vessel was employed to do had terminated, and he had returned home . . . ." The Court concluded that Baker "was not, therefore, engaged in any activity in the service of any ship at the time this incident occurred." The Court denied maintenance and cure, relying on our decision in Sellers v. Dixilyn Corporation, 5 Cir., 1970, 433 F.2d 446. We affirm.

Ocean Systems, Inc. is a diving contractor. Its base of operations is in Morgan City, Louisiana, where it maintains a shop and offices. The bulk of its work is performed offshore in the Gulf of Mexico, where Ocean does pipeline inspections, repairs, and general diving work for oil companies and pipeline operators. It makes its services available to anybody "on call" on a 24-hour basis.

Ocean hires two basic kinds of employees: "divers" and "diver-tenders." Diver-tenders assist divers in their work. They are also capable of making a dive if required. In fact, a diver-tender may on occasion do the same work as a diver. They are trainees or apprentices. When a diver-tender becomes qualified in the eyes of management and his fellow work-

ers, he is elevated to the position of diver. In the field, a diver-tender takes care of the diver's gear, tends the diver's hoses, takes care of the air compressor and the decompression chamber. He is responsible for maintenance, repairing, and painting of the equipment.

At the time of Baker's accident Ocean employed about ten divers and ten diver-tenders. It also employed several supervisors and office personnel. Of the ten tenders, only four or five ever did any diving. The wage structure and position in the company of divers was markedly different from that of diver-tenders. Divers received an annual salary of between $9,000 and $10,000 per year. In addition, they received $20 per day just for being offshore ("offshore bonus"), $15 per day for getting into the water ("get-wet pay"), and $1 per foot for dives to depths between 50 and 100 feet. The amount was increased for dives below 100 feet ("depth bonus") on a per footage basis. Divers could make up to $3,000 per month, but generally averaged around $20,000 per year.

Diver-tenders were paid at the rate of $2.75 per hour, whether they worked onshore in the shop or offshore. They were paid overtime for hours over 40 per week. If they dove, they received regular diver bonuses: $15 "get-wet pay" and "depth bonuses." In an exceptional period, a diver-tender could make up to $700 per week, but usually quite a bit less.

Divers, unlike tenders, were entitled to elect certain group insurance benefits and pension plan. Payments for these plans were deducted from the diver's pay check.

Diver-tenders did not work under written contracts. They did not sign seaman's articles. They were not guaranteed work. When they worked, they were paid; when they did not work, they were not paid. They had the option of working or not working. When a diver-tender was not working offshore, he could find maintenance, repair, and rebuilding work in Ocean's shop in Morgan City. If a diver-tender wanted to work in the shop, he had to report by 9 a. m. Nevertheless, Ocean tried to make 40 hours of work a week available for tenders at all times. During their off time, tenders were privileged to work for anyone else. They would still be subject to call if Ocean needed them.

Assignment of divers to a particular job was on a rotation basis. Thus, if a diver was the tenth diver and a job came up for ten divers, he would have been called out immediately. Ocean paid for an answering service to which all employees were to report while onshore. The answering service was badly neglected by all employees at the time of the accident. Thus, when a job arose, Ocean's dispatcher would set about contacting the necessary employees and getting the equipment ready to be loaded out. Employees were called at their homes, places of amusement or anywhere where they could be located. Depending on the nature of the job, as few as one diver and one tender might go, or as many as forty persons.

Each diver had a regular tender. Divers had the right to take their own tenders to the field. Generally, the Ocean dispatcher would check with the diver assigned to a particular job to determine which tender he wanted. He would then call that tender. Tender assignments were not permanent. Sometimes two divers would have one tender and when one diver went out he would take the tender while the other diver was onshore. It was not unusual that if a diver could not contact his favorite tender he would use another one. If a particular tender could not be located when called, someone else would go in his place. But he would not be fired or barred from future employment. Generally, if a tender was working or had been working in the shop, he was offered the job before anybody else. There was no distinction between divers and tenders in this regard, except that divers were supposed to be in the shop every day while tenders had an option not to work at all. There was work in the shop if tenders came, but they were entitled to time off if they

wanted it. If they did not want to come in, they did not have to do so. If they did not come in, their chances of getting the more lucrative offshore jobs would be decreased. Generally, when employees returned from offshore work, they took a few days off. Tenders were never paid for their time off. Tenders spent much less than 50 per cent of their total work time offshore.

Baker went to work for Ocean Systems in the early part of 1967 as a diver-tender. His diver was Donald Terry. The diving business is seasonal. Operations cannot be conducted in bad weather. Thus, in Gulf waters, summertime is the busiest season, extending from spring to early fall. Baker testified that during the winter months (October–May) of 1967, he spent only 15 to 20 days in the Gulf. He never worked off a boat during this period, only off of fixed offshore platforms. Most of his income was earned during the summer months. In the 1967 diving season, he spent about 63 days offshore, most of it on a job for Southern Natural Gas Company aboard the vessel BECK I. Most of the winter months were spent in the shop, where Baker worked regularly. He testified that he worked in the shop to prepare the men that worked on jobs which might be coming up so that there would be as little difficulty as possible when Ocean got on location. Another thing Baker did onshore was to "mix" the helium and oxygen carried in diving tanks. Both divers and tenders constantly worked to build, repair, rebuild, and maintain the equipment.

Even during the diving season, off-shore work was irregular. It could have been anywhere from 15 minutes to 1 month between offshore jobs. The time was undetermined. While August is generally a very busy month for divers, August of 1968 was not typically busy. When Ocean was called on a job, it leased or chartered different types of vessels and barges on a per diem basis. Most of these vessels were operated by the vessel owners. Ocean took no part in the navigation of vessels. Diver Donald Terry, for whom Baker tended, testified that

90 per cent of his diving was done off of boats and barges, either in the Gulf or on inland waters. The remainder of the work was off of fixed offshore platforms or solid land.

Ocean placed its own diving equipment aboard the vessels it chartered. The equipment consisted of decompression chambers, air compressors, air hoses, lines, and other items necessary to its business of diving. Divers were not assigned to any particular vessel. Ocean hired vessels from whatever boat company had a vessel, barge, or supply boat available at the time that a contract arose. Ocean employees worked on many boats and barges. Diver Terry testified that he had "worked off of just about every boat in the Gulf, I guess."

On the day prior to Baker's injury, Ocean had just completed a diving contract for Humble Pipeline Company in the Gulf of Mexico. The job began on July 17 and terminated on August 11. During this time Ocean's employees lived aboard the Derrick Barge Williams-Mc-Williams W 701. Ocean had chartered the barge specifically for the Humble job. It was returned to its homeport of New Orleans on August 11, 1968, when the job was finished, and was released by Ocean on August 13, 1968. The Humble job entailed the underwater fabrication of a "hot tap" into an oil line by placing a valve into a pipeline that was under pressure. The job entailed considerable diving. Ocean's diving equipment remained aboard the W 701 until its return to New Orleans. When the job was finished, Ocean removed all of its equipment. Ocean did not itself navigate the vessel.

Baker did as much diving as everybody else on the Humble job. He worked nearly 18 to 24 hours a day during the time he was offshore. He was paid, however, only through August 11, 1968, the day the job was completed and the day the divers and tenders returned to Grand Isle by crewboat, and from there to their homes in Morgan City by automobile. When the job was finished, Baker decided to take a few days off. On the morning of the accident, Baker came to

Ocean's shop to pick up some money to pay a number of bills which had become overdue because he had been in the Gulf so long. He did not report for work on the day of the accident and was not paid for work after August 11. Later that afternoon, while in the Cross Roads Lounge talking to his girl friend, he was severely injured. The Trial Judge found that he had reported to the company's answering service, "that he was on call, and had he been called at any time, he would have returned immediately and gone to work. But he was not called. He did not avail himself of the opportunity to work in the shop on that day . . . ." There is no evidence in the record as to when Baker might have worked offshore on a vessel again. He could have reported any day, of course, within his own discretion, to work in the company's shop in Morgan City.

.Seamen are traditionally wards of courts of admiralty jurisdiction. Cortes v. Baltimore Insular Line, 287 U.S. 367, 377, 53 S.Ct. 173, 176, 77 L.Ed. 368 (1932); Robertson v. Baldwin, 165 U.S. 275, 287, 17 S.Ct. 326, 331, 41 L.Ed. 715 (1897). The ancient right of a seaman to be maintained and cared for when injured in the service of his vessel is a right which courts have carefully protected.[1] Justice Cardozo remarked that the obligation of a shipowner to pay maintenance and cure was annexed to the seaman's contract of employment; but "[c]ontractual it is in the sense that it has its source in a relation which is con-

tractual in origin, but, given the relation, no agreement is competent to abrogate the incident." Cortes v. Baltimore Insular Line, 287 U.S. 367, 371, 53 S.Ct. 173, 174, 77 L.Ed. 368 (1932). In the landmark case of O'Donnell v. Great Lakes Dredge & Dock Co., 318 U.S. 36, 63 S.Ct. 488, 87 L.Ed. 596 (1943), Chief Justice Stone noted, "From its dawn, the maritime law has recognized the seaman's right to maintenance and cure for injuries suffered in the course of his service to his vessel, whether occurring on sea or on land." 63 S.Ct. at 491. The Court further said, "In its origin maintenance and cure must be taken as an incident to the status of the seaman in the employment of his ship." 63 S.Ct. at 492. The Court in O'Donnell said.that the Jones Act, 46 U.S.C. § 688, "has done no more than supplement the remedy of maintenance and cure for injuries suffered by the seaman, whether on land or sea . . . ." 63 S.Ct. at 492. In Braen v. Pfeifer Oil Transportation Co., 361 U.S. 129, 80 S.Ct. 247, 4 L.Ed. 2d 191 (1959), the Court said that the term "course of employment" is the equivalent of the term "service of the ship" used in maintenance and cure cases. 80 S.Ct. at 250.[2]

■ Baker contends that the District Court erred in finding that he was not "answerable to the call of duty" by his employer as a seaman in the service of his vessel (actually a fleet of vessels which had been or would thereafter be

1. "Certainly the nature and foundations of the liability require that it be not narrowly confined or whittled down by restrictive and artificial distinctions defeating its broad and beneficial purposes. If leeway is to be given in either direction, all the considerations which brought the liability into being dictate it should be in the sailor's behalf." Aguilar v. Standard Oil Co., 318 U.S. 724, 735, 63 S.Ct. 930, 936, 87 L.Ed. 1107 (1943).

2. The pertinent part of the opinion in Braen (80 S.Ct. at 250) reads as follows: "These two cases [Aguilar v. Standard Oil Co., 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107, and Warren v. United States, 340 U.S. 523, 71 S.Ct. 432, 95 L. Ed. 503] were not brought under the

Jones Act but involved maintenance and cure. Yet they make clear that the scope of a seaman's employment or the activities which are related to the furtherance of the vessel are not measured by the standards applied to land-based employment relationships. They also supply relevant guides to the meaning of the term 'course of employment' under the Act since it is the equivalent of the 'service of the ship' formula used in maintenance and cure cases. See Gilmore and Black, The Law of Admiralty, p. 284. And see O'Donnell v. Great Lakes Co., supra, 318 U.S. at page 43, 63 S.Ct. at page 492; Marceau v. Great Lakes Transit Corp. [2 Cir., 146 F.2d 416] supra."

chartered by his employer). We reject this contention.

In Aguilar v. Standard Oil Co., 318 U. S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1943), decided as a companion case with Waterman S. S. Corporation v. Jones, and decided the same term as *O'Donnell*, supra, the Supreme Court held that a seaman who was injured either while departing from (Jones) or returning to (Aguilar) his vessel on authorized shore leave in a foreign port was entitled to maintenance and cure. The Court regarded both seamen as being in the service of their respective vessels at the time of the injury, concluding that even if they had been on their own personal business ashore, that they were nevertheless "subject to the call of duty as a seaman, and earning wages as such."

The Court in *Aguilar* enumerated many of the policy considerations which were determinative in the case. It said:

"From the earliest times maritime nations have recognized that unique hazards, emphasized by unusual tenure and control, attend the work of seamen. The physical risks created by natural elements and the limitations of human adaptability to work at sea enlarge the narrower and more strictly occupational hazards of sailing and operating vessels. And the restrictions which accompany living aboard ship for long periods at a time combine with the constant shuttling between unfamiliar ports to deprive the seaman of the comforts and opportunities for leisure, essential for living and working, that accompany most land occupations. Furthermore, the seaman's unusual subjection to authority adds the weight of what would be involuntary servitude for others to these extraordinary hazards and limitations of ship life.

"Accordingly, with the combined object of encouraging marine commerce and assuring the well-being of seamen, maritime nations uniformly have imposed broad responsibilities for their health and safety upon the owners of ships." 318 U.S. at 727, 63 S.Ct. at 932.

In Warren v. United States, 340 U.S. 523, 71 S.Ct. 432, 95 L.Ed. 503 (1951), the Court held that the maintenance and cure obligation is equally applicable to injuries actually received on land "during the period of relaxation while on shore as it is to those received while reaching it." 340 U.S. at 530, 71 S.Ct. at 436. The same policy considerations which persuaded the *Aguilar* Court underscored the *Warren* decision. The Fifth Circuit has not deviated from these holdings. See Central Gulf Steamship Corporation v. Sambula, 5 Cir., 1968, 405 F.2d 291; Dailey v. Alcoa Steamship Company, E.D.La., 1963, 219 F.Supp. 601, aff'd. 5 Cir., 1964, 337 F.2d 611.

The determination of whether a seaman is "in the service of the vessel" and "answerable to the call of duty" at the time of the accident depends on the particular facts and circumstances of each case. Nevertheless, it is clear as a matter of law that the seaman's answerability to the "call to duty" imports at the very least some binding obligations on the part of the seaman to serve. The nature of an articled seaman's duty was clearly delineated by the Supreme Court in *Aguilar,* where the Court noted that the seaman's subjection to authority amounted to "what would be involuntary servitude for others . . ." 318 U.S. at 727, 63 S.Ct. at 932, and that

"[u]nlike men employed in service on land, the seaman, when he finishes his day's work, is neither relieved of obligations to his employer nor wholly free to dispose of his leisure as he sees fit. Of necessity, during the voyage he must eat, drink, lodge and divert himself within the confines of the ship. In short, during the period of his tenure the vessel is not merely his place of employment; it is the framework of his existence. For that reason among others his employer's responsibility for maintenance and cure extends beyond injuries sustained because of, or while engaged in, activities required by his employment." 318 U.S. at 731–732, 63 S.Ct. at 934.

A seaman under articles, such as in *Aguilar* or *Warren*, supra, remains legal-

ly bound to his vessel throughout the voyage referred to in his articles. He is bound by the contract of employment, enforceable in case of desertion under the general maritime law, Tucker v. Alexandroff, 183 U.S. 424, 22 S.Ct. 195, 46 L.Ed. 264 (1902), and by force of statute, Merchant Seaman's Act, 46 U.S.C. § 701 et seq. A merchant seaman under articles who does not report when ordered, even after shore leave, is considered a deserter and penalized appropriately. 46 U.S.C. § 701.

■ The fact that a seaman is "answerable to the call of duty" imports a legal obligation both on the part of the seaman, enforceable by the shipowner, and on the part of the vessel, to pay him and provide maintenance and cure in times of illness or injury, enforceable by the seaman in courts of admiralty. It is because the seaman remains bound to the vessel that the vessel and the shipowner are correspondingly obligated to him for maintenance and cure in case of injury. These reciprocal obligations determine an individual's status as a seaman, and whether the seaman is in the service of his vessel.[3]

In Blanco v. The S. S. Tracy, 4 Cir., 1959, 272 F.2d 93, the seaman made claim for maintenance and cure for injuries sustained on shore while on leave. He had secured a leave of absence for two trips of the vessel, and fractured his leg while getting into his automobile at a drive-in restaurant. The Court denied the claim and said, "In this case Blanco had a right, under his membership in the Union, to have it tender him through the employment office to the ship for employment (or reemployment) if he so applied at the expiration of the second voyage (approximately fifteen days) or perhaps within thirty days, from the beginning of his leave of absence. Blanco was under no legal obligation so to apply; nor were respondents required to reemploy him if he was not 'satisfactory.'" 272 F. 2d at 98. The Ninth Circuit decision in Matson Navigation Company v. Lawler, 9 Cir., 1954, 217 F.2d 645, cited by Baker, is not to the contrary. Matson was a seaman under articles who served his vessel as a waiter. He requested shore leave to go to his home to obtain some belongings to take with him on the forthcoming voyage. He was injured during his authorized leave, and maintenance was correctly allowed by the Court under the circumstances of that case which are easily distinguishable from the facts here.

In two recent cases in this Circuit involving offshore workers such as Baker, we have had occasion to examine the nature of the obligation owed by a seaman to his vessel necessary to be considered in its service. In Sellers v. Dixilyn Corporation, 5 Cir., 1970, 433 F.2d 446, we held that an offshore worker, whom we assumed to be a "seaman," was not entitled to maintenance and cure for an injury received in an automobile accident while going from work to his home at the commencement of his off period. He worked a "seven on/seven off" schedule. His off-duty time was his own to spend "as [he] pleased, even to the extent of obtaining other employment during that time if [he] wished." Id. at 448. Moreover, while Dixilyn admitted that it might call him back to work in case of emergency, "whether he did return was purely discretionary on the man's part." Id. at 448. We concluded that when Sellers was injured he was not serving any direct or indirect interest of his employer, and was neither on authorized shore leave nor answerable to the call of duty. Id. at 448, 449.[4]

3. The First Circuit in Haskell v. Socony Mobil Oil Company, 1956, 237 F.2d 707, 710, rejected the claim of a seaman who claimed maintenance and cure for an injury which occurred during his vacation. The Court in that case said, "Proof of willingness to serve does not show an obligation to do so. If anything it indicates the contrary."

See also Keeping v. Dawson, 1 Cir., 1959, 262 F.2d 868, where the Court found that the seaman was not answerable to the call of duty by the master of his vessel where he had taken a full day off.

4. Compare Vincent v. Harvey Well Service, 5 Cir., 1971, 441 F.2d 146.

In the case of Daughdrill v. Diamond M. Drilling Co., 5 Cir., 1971, 447 F.2d 781, we reversed a judgment in favor of the survivors of a seaman who claimed under the Jones Act for his wrongful death. He was killed while going from his home to work. The material facts concerning his status were virtually indistinguishable from those in the *Sellers* case. We noted, among other things, that while off duty both Sellers and Daughdrill were "free to do as they pleased—relax, work for themselves, or work for others." Id. at 784. Moreover, "In both cases, they were rarely, if ever, called to work on their days off, and if called, failure to answer the call had no effect on their employment." Id. at 784.

The same material facts are involved in this case. Baker was paid only when he worked. On the day of his injury he was not doing any work for Ocean Systems. He was on his own business. It is true that he was subject to being called to come back to work, and that if he had been called he would have been willing to return. But the record shows that he was not under obligation to answer the call of duty in the service of any vessel, and Ocean was under no obligation to reemploy him.

Affirmed.