**Basilio SAMBULA**

v.

**CENTRAL GULF STEAMSHIP CO.**

**No. 64–H–58.**

United States District Court
S. D. Texas,
Houston Division.

May 2, 1967.

John N. Barnhart, Mandell & Wright, Houston, Tex., for plaintiff.

R. Gordon Gooch, Baker, Botts, Shepherd & Coates, Houston, Tex., for defendant.

## MEMORANDUM AND OPINION

SINGLETON, District Judge.

This is a Jones Act, 46 U.S.C.A. § 688, suit brought by Basilio Sambula, a seaman, against Central Gulf Steamship Co., owner of the SS GREEN POINT, to recover damages for the loss of his right eye as a result of Central Gulf's negligence in failing to provide proper medical treatment.

Based on the evidence and arguments of counsel at the trial of this case on April 12, 1967, the Court makes the following findings of fact and conclusions of law.

### I.

In January 1964, Sambula, a seaman of some 20 years experience, was a messman in the service of the SS GREEN POINT, bound for Singapore. On January 12, 1964, at about 8:30 P.M., while on shore leave at Inchon, Korea, plaintiff was attacked and robbed by three unidentified Korean hoodlums. During the affray, plaintiff received a severe blow and cut in the area of the right eye. He was left unconscious in the street. After regaining consciousness plaintiff began looking for help. Within a few minutes he happened upon a Korean whom he recognized as having been a guest at the officers' mess aboard the SS GREEN POINT. This man was Yung Keun Choi, President of the Oriental Marine Service Company, one of Central Gulf Steamship Company's Inchon agents.

When Choi saw Sambula, he noted profuse bleeding from a cut beside the eye. At this point the evidence indicates that the condition of the eye itself was such that even a layman could have recognized the possibility of internal eye damage.

Choi took Sambula to the Kyonggi Hoosaing Public Hospital where Dr. Sung Hwi Lee, a Korean-trained general practitioner, examined and treated the eye. Neither Choi nor Dr. Lee could speak English. Sambula cannot speak Korean.

Dr. Lee's testimony in this court was by way of translated interrogatories. When Dr. Lee first saw plaintiff at about 10:00 that evening, the area around the eye was swollen and bleeding. Dr. Lee's examination of the interior of the eye revealed bleeding, hyperemia of the retina, and "swelling" and "dark bluish" color on the periphery of the retina (Cross-interrogatory III C and D). Dr. Lee concluded, however, that "there were no dangerous symptoms." (Interrogatory No. 16) While the "vision of the right eye was a little weak," (Cross-interrogatory III B), Sambula's right eye vision was essentially normal. Dr. Lee's treatment included wiping out the eye with boric acid sponges and normal saline, putting drops in the eye, administering a tranquilizer and an antibiotic injection, and bandaging the eye.

"The doctor did not give any special instructions, because Sambula had only light injuries." (Choi's Cross-interroga-

tory No. 6; Song's Cross-interrogatory No. 6) There is no evidence that the doctor recommended that Sambula remain in the hospital overnight.

Following this treatment, the evidence is in conflict as to whether Choi took Sambula back to the ship or to a hotel room. At any rate, Dr. Lee testified that he examined Sambula on January 13 and 14 and found no significant change in the condition of the eye. There is no doubt that Sambula had vision in his right eye on both occasions.

At the time of Sambula's injury, there were at least two recognized specialists in the practice of ophthalmology residing in Inchon. According to Dr. Lee, a Dr. Lee Hong Kyo is a well-known eye specialist who practiced and resided in Inchon. Dr. Lee was also aware of an eye specialist "who is better than I" (Cross-interrogatory No. V) at the Christian Hospital. No reason was given for not consulting one of these specialists. In addition, within thirty minutes drive from Inchon, the 121 U. S. Army Evacuation Hospital employed an ophthalmologist and contained complete eye diagnostic and treatment facilities which were available for the treatment of American seamen.

Dr. Lee reported to the Captain that Sambula was fit to sail for Singapore if he were allowed to rest in his bunk. Following this advice, the Captain allowed Sambula to sail with the SS GREEN POINT for Singapore on January 14.

During the voyage Sambula remained in his room, which was shared with three other men, although the ship contained a hospital room. The general surroundings were not conducive to rest. He spent the greater part of his time in bed, but had to get up to eat and go to the toilet. The mate and/or the Captain visited Sambula every day to check on his condition and administer drops to his eye.

When the voyage began, Sambula's eye was bandaged, but he had vision. Sambula testified that on the second or third day out he lost vision in his right eye, suddenly and completely, accompanied by severe pain.

Upon arrival in Singapore on January 21, 1964, Sambula was taken immediately to Dr. Wong Kin Yip, an ophthalmologist, who recommended removal of the eye at the earliest possible date. In his interrogatories, Dr. Yip states that blindness resulted from a ruptured globe caused by the initial blow to the eye. According to this doctor, Sambula should have been placed under the care of an ophthalmologist in Inchon. His opinion that blindness would probably have resulted regardless of treatment is in conflict with the opinion of Dr. Brandon (see below) and can be given little weight in this case because the facts upon which he based the opinion were not introduced into evidence.

Sambula was flown at the ship's expense from Singapore to the United States. On February 4, the eye was removed at the Public Health Hospital at Galveston.

The report of the post operative pathological examination of the eye confirmed the hypothesis of ruptured globe, more specifically at the equator superiorly and laterally. Blindness was caused by blood hemorrhaging through the rupture and separating the retina from the back wall of the eye. The eye cavity was filled with clotted blood.

The operation was successful. Plaintiff was fitted with an artificial eye and subsequently certified fit for duty as a messman.

Dr. Sylvan Brandon, an ophthalmologist, was the only medical expert to testify at the trial. His testimony may be summarized as follows. When confronted with the facts set out hereinabove, Dr. Brandon stated that in all medical probability blindness was caused by a secondary hemorrhage. The globe was ruptured by the blow to the eye. However, the initial rupture clotted over and the retina was not destroyed at this time. As long as the clot remained in place vision was not lost. Only when the clot

broke loose several days later with the attendant hemorrhaging of blood into the eye cavity was the retina destroyed and vision irreparably lost. This was the secondary hemorrhage. The normal strain of getting up to eat and go to the bathroom was sufficient to cause the clot to break loose. Therefore, the only proper medical treatment for a ruptured globe is complete bed rest under hospital care. Bed rest under other than hospital conditions would not, in Dr. Brandon's opinion, be proper medical care. If Sambula had been given complete hospital bed rest, which he could not receive aboard the ship, the clot might have strengthened, the rupture healed, and blindness avoided. Blindness was not inevitable at the time of the initial injury. In Dr. Brandon's opinion, a general practitioner is not qualified to treat an injury of this nature.

Dr. Lee's answers to interrogatories and medical reports show that he failed to diagnose correctly the injury to Sambula's eye. The crucial fact question with regard to Dr. Lee's conduct is therefore whether the symptoms apparent to Dr. Lee were sufficient to compel a proper diagnosis. According to Dr. Brandon they were. The swelling and dark bluish color on the periphery of the retina, according to Dr. Brandon, was the unmistakable key to a proper diagnosis of the ruptured globe. When that symptom was noted, proper medical care would dictate that Sambula be hospitalized immediately and the services of an expert ophthalmologist secured. Contrary to the conclusion of Dr. Lee, the presence of the swelling and bluish color on the retina was a dangerous symptom of which proper account should have been taken. Dr. Lee's statement that he found no dangerous symptoms can only be taken as an admission that he failed to recognize what Dr. Brandon says is a clear danger signal.

In summary, the globe of plaintiff's eye was ruptured by the blow he received in the street fight. Although injury to the eye itself was apparent, plaintiff was not taken to an eye specialist. Instead, he was taken to a general practitioner who failed to diagnose the rupture because he did not take proper account of the swelling and bluish color at the periphery of the retina. Having failed to make the proper diagnosis, that doctor of course failed to prescribe proper medical treatment. He also failed to consult ophthalmologists available in Inchon. Plaintiff was thus permitted to return to the ship and engage in a course of conduct which was calculated to cause the secondary hemorrhage. The secondary hemorrhage was the cause of blindness.

As a result of the loss of his eye, plaintiff has experienced pain and suffering and great personal inconvenience in the conduct of his daily affairs.

## II.

■ The facts in this case clearly show that Dr. Lee was negligent in failing to diagnose and treat properly Sambula's eye. He was further negligent in failing to consult one of the available eye specialists.

■ The question of whether this negligence is imputed to the ship is governed by the principles enunciated in De Zonn v. American President Lines, 318 U.S. 660, 63 S.Ct. 814, 87 L.Ed. 1065 (1943). In that case, the doctor had been employed to work onboard the ship during the voyage. The ship claimed its duty was discharged by exercising due care in selecting this doctor. In rejecting this contention, the court held that the ship's duty of care in providing medical treatment to an injured seaman does not cease upon the exercise of due care in the selection of the ship's physician, but extends also to the quality of treatment administered by that physician in a particular situation. Even the best qualified doctor may, on a given occasion, be negligent. The ship, under De Zonn, is liable for the negligence of its well-qualifed doctor. Under the facts in the present case, this Court can find no reason for the distinction suggested by the Supreme Court between treatment given by an onboard ship's doctor and

that given by a shoreside independent practitioner who was employed by the ship to treat its injured seaman.[1] Therefore, Central Gulf Steamship Company is liable for the negligence of the doctor it employed to treat Sambula.

 Disregarding for the moment its liability for Dr. Lee's negligence, the ship was also guilty of negligence in its selection of Dr. Lee as the treating physician. Neither Dr. Lee nor the ship's agent could speak or understand English. Plaintiff could therefore not communicate his symptoms or understand any advice which may have been given. Moreover, the outward appearance of Sambula's eye should have put even a layman on notice that the services of an eye specialist were required. The fact that an ophthalmologist may not have been immediately available would not excuse the failure to consult one on the following day, or at some time before allowing Sambula to sail for Singapore.

Sambula's eye was not irreparably lost for several days after the injury during the voyage to Singapore. He should have been hospitalized in Inchon as soon as possible. This was not done either because Dr. Lee failed to recognize the clear danger signal or because the ship's agent failed to provide a proper doctor. Either act was negligent and is imputed to the ship.

 While defendant's negligence in this case is well established, the question of causation, the relationship between that negligence and the loss of the eye, has been of some concern to this Court. In arguing his case, defendant asserted that plaintiff had the burden of showing that proper medical treatment, if administered would, as a reasonable medical probability, have prevented blindness. In other words, defendant contends that plaintiff cannot recover unless he can affirmatively show that proper medical treatment would have, as a reasonable medical probability, avoided loss of the eye. Assuming the record to be devoid

of such testimony, defendant finds some support for this position in Cortes v. Baltimore Insular Lines, Inc., 66 F.2d 526 (2nd Cir. 1933); and in this Circuit Miller v. Lykes Bros.-Ripley S.S. Co., 98 F.2d 185 (5th Cir. 1938); Samanski v. Mobile Seafood Co., Inc., 258 F.2d 823 (5th Cir. 1958); Inter-Caribbean Shipping Corp. v. Sentilles, 256 F.2d 156 (5th Cir. 1958), reversed 361 U.S. 107, 80 S. Ct. 173, 4 L.Ed.2d 142 (1959).

The above authorities notwithstanding, this Court's reading of the Supreme Court opinion in *Sentilles* and later Fifth Circuit opinions, renders defendant's contention untenable. In *Sentilles*, plaintiff's suit was based upon aggravation of a pre-existing tubercular condition by a blow to the chest. Plaintiff's medical witnesses indicated the possibility, but not the probability, that the injury in question aggravated the tubercular condition. The jury found for plaintiff. In a split decision, the Fifth Circuit reversed, holding that a directed verdict should have been granted:

> "The least that the appellee was required to prove was that the aggravation of his tubercular condition was *probably* caused by the incident on shipboard. The most that he established was that the incident was a *possible cause* of the aggravation. This was not enough." (256 F.2d at p. 158) (Emphasis added)

The Supreme Court reversed the Fifth Circuit on the question of causation:

> "The jury's power to draw the inference that the aggravation of petitioner's tubercular condition, evidenced so shortly after the accident, was in fact caused by that accident, was not impaired by the failure of any medical witness to testify that it was in fact the cause. * * * The matter does not turn on the use of a particular form of words by the physicians in giving their testimony. The members of the jury, not the medical witnesses, were sworn to make a legal determina-

---

1. "We express no view as to the liability for malpractice by one not in the employ of the ship." (At p. 668, 63 S.Ct. at p. 819.)

tion on the question of causation. They were entitled to take all circumstances, including the medical testimony, into consideration." (At pp. 109–110)

Subsequent Fifth Circuit cases citing *Sentilles* have consistently applied the principle that the trier of fact is free to determine causation in the absence of testimony based on reasonable medical probability. Great American Indemnity Co. v. Holloway, 286 F.2d 106 (5th Cir. 1960); Schlichter v. Port Arthur Towing Co., 288 F.2d 801 (5th Cir. 1961); Vickers v. Tumey, 290 F.2d 426 (5th Cir. 1961); Shahid v. Gulf Power Co., 291 F.2d 422 (5th Cir. 1961); Todd Shipyards Corp. v. Donovan, 300 F.2d 741 (5th Cir. 1962).

Most recently in Rewis v. United States, 369 F.2d 595 (5th Cir. Dec. 1966) the trial court was reversed for accepting the rule urged by defendant herein:

"[I]t appears that the trial court based its judgment * * * upon the failure of any witness to testify in effect that 'to a reasonable degree of medical certainty' the child's life could have been saved. No such testimony is required in a case of this kind. The Court, upon the record as a whole, including the testimony of all witnesses bearing upon the subject is, as the fact finder, required to determine for itself whether a proper diagnosis and treatment [on the date in question] would likely have prevented the loss of this life."

Long before *Sentilles*, in The Iroquois, 194 U.S. 240, 24 S.Ct. 640, 48 L.Ed. 955 (1904), defendant's contention herein was placed to rest. In that case, the Supreme Court held the ship owner liable for negligence in failing to put ashore to secure proper medical treatment for an injured seaman, even though there was no certainty that proper medical treatment would have caused the injured seaman's injuries to heal properly. After determining that failure to put into port was negligence, the court stated: "[T]here was at least a chance [of heal-

ing] by proper treatment." (P. 247, 24 S. Ct. p. 643) The ship in that case was liable for not taking that chance.

It is therefore the conclusion of this Court that the absence of testimony to the effect that proper medical care would, in reasonable medical probability, have prevented blindness does not preclude the trier of fact, in this case the Court, from finding the necessary causal relationship between defendant's negligence and plaintiff's injuries.

■ The question of whether that relationship did in fact exist in this case must be answered in the affirmative. Sambula's eye had a chance of healing with proper medical care. That chance in this case was not "mere speculation or conjecture." Miller, supra, 98 F.2d at p. 186. The testimony of Dr. Brandon indicates that the eye was not irreparably lost at the time of the blow and that proper medical care offered some hope of preventing blindness. This testimony, taken together with the fact that blindness did not occur for almost a week after the injury, has convinced this Court that the negligence of defendant was a proximate cause of plaintiff's injury.

■ The blow to Sambula's eye placed in motion a chain of circumstances which would ultimately produce blindness unless some intervening act interrupted the sequence. By virtue of the guardian-ward relationship existing between ship owner and seaman, it was defendant's duty to intervene by providing proper medical care. This duty was breached. Certainly, at that point it was foreseeable that the breach of the duty to provide proper medical care would result in blindness.

■ Taking the evidence as a whole, plaintiff has sustained the burden of showing:

"[T]hat employer negligence played any part, even the slightest, in producing the injury * * * for which damages are sought." Rogers v. Missouri Pacific Ry. Co., 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957)

In conclusion, defendant has committed negligent acts. Plaintiff's blindness was caused in whole or in part by such negligence. Plaintiff is therefore entitled to recover from defendant the sum of $32,500.00 as just compensation for the loss of his eye.

Counsel for plaintiff will draft and submit to the Court an appropriate form of judgment, after first securing approval as to form from counsel for defendant.