**Richard CARTER**

v.

**BISSO MARINE CO., INC.**

No. 01–2448.

United States District Court, E.D. Louisiana.

Oct. 17, 2002.

Lawrence Best, New Orleans, LA, Peter Koppel, for plaintiff.

Russell Jarrett, for defendant.

---

## ORDER

DUVAL, District Judge.

Before the Court are four motions by defendant Bisso Marine Company, Inc.: (1) a Motion for Summary Judgment as to Plaintiff's Alleged Seaman Status; (2) a Motion for Partial Summary Judgment as to Plaintiff's Claim for Unseaworthiness; (3) a Motion for Summary Judgment as to Plaintiff's Accident of December 2000; and (4) a Motion for Summary Judgment as to Plaintiff's accidents in 1992 and 1993. Having considered the parties' pleadings and exhibits, together with the relevant law, the Court denies the first three motions, but grants the fourth motion for the reasons that follow.

## BACKGROUND

Plaintiff, Richard Carter, brought this admiralty suit to recover damages under the Jones Act and general maritime law. Carter claims he suffered back injuries on January 26, 2000, and again on December 15, 2000, due to the negligence of his employer, Bisso Marine, and/or the unseaworthiness of its vessel, the BULLS EYE.

The BULLS EYE is a 28–foot survey vessel with twin outboard engines. It was constructed in 1996 specifically for Bisso Marine's survey activities, and was designed to be hauled overland by trailer from project to project. When not engaged in survey operations, the BULLS EYE is ordinarily kept on its trailer at Bisso Marine's yard in New Orleans.

At the time of his injuries, Carter headed Bisso Marine's survey department. Carter solicited and accepted orders from customers, coordinated survey projects with other surveyors, and prepared survey reports. Carter also worked in the field. He would tow the BULLS EYE to and from survey jobs using a pick-up truck Bisso Marine had provided him. He would launch and operate the vessel, deploy sounding equipment, and conduct underwater surveys. Carter also performed routine maintenance on the BULLS EYE, and at times he serviced other Bisso Marine vessels, particularly their electronic instrumentation.

According to his Supplemental and Amending Complaint (Doc. No. 16), Carter's first injury took place on or about January 26, 2000. The BULLS EYE had undergone repairs at a marine dealer in Slidell, Louisiana, and was due to be returned to Bisso Marine. While attempting to attach the BULLS EYE's trailer to the hitch on Bisso Marine's truck, Carter turned the trailer's jack handle and experienced lower back pain.

Carter's second injury occurred nearly eleven months later. Bisso Marine had contracted to perform a depth survey at a shipyard in Mobile, Alabama on Monday, December 18, 2000. On the Thursday before this project was to begin, Carter was given permission to take the BULLS EYE to his home in Poplarville, Mississippi. Carter spent the next day in his driveway cleaning and preparing the BULLS EYE for the Mobile survey. The BULLS EYE remained on its trailer, and the trailer remained connected to Bisso Marine's pick-up truck. That evening, Carter tried to unhitch the trailer from the truck. As he turned the trailer's jack handle to raise

the trailer tongue, he injured his neck and upper back.

Bisso Marine now contends that, as a matter of law, (1) Carter is not a seaman; (2) the BULLS EYE was not in navigation at the time of Carter's January 26 and December 15, 2000 injuries; and (3) Carter was not acting in the course of his employment at the time of his December 15, 2000 injury. The Court addresses each argument in turn.

## ANALYSIS

### A. Motion for Summary Judgment Standard.

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the

movant meets this burden, the burden shifts to the non-movant "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. "[M]ere allegations or denials" will not defeat a well-supported motion for summary judgment. Fed.R.Civ.P. 56(e). Rather, the non-movant must come forward with "specific facts" that establish an issue for trial. *Id.*

When deciding a motion for summary judgment, the Court must avoid a "trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are tasks for the trier-of-fact. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. To that end, the Court must resolve disputes over material facts in the non-movant's favor. "The party opposing a motion for summary judgment, with evidence competent under Rule 56, is to be believed." *Leonard v. Dixie Well Service & Supply, Inc.*, 828 F.2d 291, 294 (5th Cir.1987).

### B. Defendant's Motion as to Plaintiff's Alleged Seaman Status.

■ The determination of seaman status is a mixed question of law and fact that is generally left to the trier-of-fact. *Harbor Tug and Barge Co. v. Papai*, 520 U.S. 548, 554, 117 S.Ct. 1535, 137 L.Ed.2d 800 (1997). "Nevertheless, 'summary judgment . . . is mandated where the facts and the law will reasonably support only one conclusion.'" *Id.* (quoting *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 356, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991)).

■ To qualify as a seaman under the Jones Act, a maritime worker must demonstrate an "employment-related connection to a vessel in navigation." *Wilander*, 498 U.S. at 355, 111 S.Ct. 807. A plaintiff alleging seaman status must satisfy a two-

prong test. *Chandris, Inc. v. Latsis,* 515 U.S. 347, 376, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995). First, his "duties must contribute to the function of the vessel or to the accomplishment of its mission." *Id.* Second, he "must have a connection to a vessel in navigation (or an identifiable group of such vessels) that is substantial in terms of both its duration and its nature." *Id.*

■ An employee who "do[es] the ship's work" will satisfy the first *Chandris* prong. *Chandris,* 515 U.S. at 368, 115 S.Ct. 2172. "This threshold requirement is very broad." *Id.* The second *Chandris* prong is meant "to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation." *Id.* Although the nature of the worker's activities is relevant to the seaman status inquiry, "it is not the employee's particular job that is determinative, but the employee's connection to a vessel." *Id.* at 364, 115 S.Ct. 2172 (quotations and citations omitted). The court must examine the plaintiff's overall "employment-related connection . . . to a vessel in navigation," not simply the immediate circumstances or location of the plaintiff's injury. *See id.* at 363, 115 S.Ct. 2172. Finally, an employee "who spends only a small fraction of his working time" aboard a vessel in navigation is not a seaman, regardless of his duties. *Id.* at 371, 115 S.Ct. 2172. As a general rule, an employee "who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman." *Id.*

■ Relying solely on this 30 percent temporal guideline, Bisso Marine argues that Carter "did not spend the requisite amount of work time aboard a vessel." It says its payroll records prove that Carter spent, at most, 22 percent of his working time aboard the BULLS EYE in 2000, and less than 10 percent of his working time aboard the BULLS EYE in 1999.

Carter earned a $100 bonus for every day he used the BULLS EYE on a survey project. Bisso Marine's records show that Carter earned 57 days of bonus pay in 2000, and 25 days of bonus pay in 1999. Bisso Marine divides these figures by 260, the number of work days in one year, to arrive at the above percentages. According to Bisso Marine, these calculations actually overstate the time Carter spent aboard the BULLS EYE because Carter earned a full day's bonus even on survey projects that lasted less than eight hours. Bisso Marine also maintains that any time Carter spent towing or maintaining the BULLS EYE while the vessel was trailered is irrelevant for purposes of calculating the time Carter spent in service to a vessel, because, by definition, a vessel may be "in navigation" only when it is in the water.

Carter disputes these calculations. First, Carter claims that Bisso Marine's 260–day work year fails to account for vacation time, holidays, and the fact that Carter did not work during the last two weeks of December 2000. Second, Carter asserts that he regularly performed maintenance on the BULLS EYE between surveys. Third, he states that he "routine[ly]" worked on every vessel in the Bisso Marine fleet. Although unable to quantify the amount of time he spent on vessels other than the BULLS EYE, Carter alleges that on a typical day he would have performed at least some work on Bisso Marine's tugboats or supply boats, primarily servicing their electronic equipment. When pressed at his deposition, Carter estimated that he spent 50 percent of his time aboard Bisso Marine vessels.

█ A plaintiff may establish the requisite connection to a vessel in navigation by aggregating time served on vessels that are "under common ownership or control." *Papai*, 520 U.S. at 556, 117 S.Ct. 1535 (quoting *Chandris*, 515 U.S. at 366, 115 S.Ct. 2172). Bisso Marine's motion speaks only to Carter's work on the BULLS EYE. It does not at all address the frequency and extent of Carter's work on other vessels in the Bisso Marine fleet. Even if Bisso Marine's calculations are entirely accurate, the Court cannot automatically disregard the time Carter spent on these other vessels.

Finally, as discussed *infra* Part C, the Court does not accept Bisso Marine's contention that a vessel on land is, as a matter of law, not in navigation. The work Carter performed on the BULLS EYE while it was on land may well be relevant to the issue of seaman status provided the BULLS EYE remained in navigation during these times, which is itself a factual determination. *See Chandris*, 515 U.S. at 373–75, 115 S.Ct. 2172.

In short, questions of material fact remain as to whether Carter falls short of the 30 percent temporal threshold for seaman status. *See Leonard v. Dixie Well Service & Supply, Inc.*, 828 F.2d 291, 295 (5th Cir.1987). Bisso Marine's Motion for Summary Judgment as to Plaintiff's Alleged Seaman Status must be denied.

**C. Defendant's Motion for Partial Summary Judgment as to Plaintiff's Claim for Unseaworthiness.**

█ Bisso Marine next argues that because the BULLS EYE was out of the water and on its trailer at the time of Carter's injuries, the BULLS EYE was not in navigation, and that Carter's unseaworthiness claim must therefore be dismissed.

█ The duty to furnish a seaworthy vessel can only attach to a vessel in navigation. *Roper v. United States*, 368 U.S. 20, 24, 82 S.Ct. 5, 7 L.Ed.2d 1 (1961). The owner of a vessel withdrawn from maritime service owes no duty of seaworthiness. *Johnson v. Oil Transport Co.*, 440 F.2d 109, 111–13 (5th Cir.1971). However, a vessel *may* be in navigation for purposes of an unseaworthiness claim even if the vessel is removed from navigable waters. In *Delome v. Union Barge Line Co.*, 444 F.2d 225 (5th Cir.1971), a shipfitter, Delome, was injured while working on a barge that had been brought ashore for hull repairs. At the time of the incident, the barge rested on a marine railway some sixty-five feet from the water's edge. The barge owner challenged Delome's right to recover for unseaworthiness on both jurisdictional and substantive grounds.[1]

The Fifth Circuit explained that the admiralty court's jurisdiction over Delome's unseaworthiness action depended not merely on the situs of the barge at the time of the injury, but on the status of the barge and the nature of the plaintiff's work. The existence of the duty of seaworthiness "and federal jurisdiction to consider alleged breaches depend on conceptual considerations, such as status.... The 'in navigable waters' spatial limitation is not determinative." *Id.* at 231.

Instead, the court looked to the "status" factors set forth in *West v. United States,*

---

**1.** When Delome was injured, the shipowner's obligation to provide a seaworthy vessel extended to certain longshore and harbor workers who, although not qualifying as Jones Act seamen, nevertheless performed work traditionally done by seamen. *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). The 1972 Amendments to the LHWCA eliminated the unseaworthiness remedy for longshore and harbor workers covered by the Act. *See* 33 U.S.C. § 905(b).

361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959), to decide whether the barge owner owed Delome a duty of seaworthiness. The *West* factors include the status of the vessel, the overall pattern of repairs, and the extent of the work to be done. *West*, 361 U.S. at 122, 80 S.Ct. 189.[2] Applying these factors, the court found that the barge "was a vessel *in navigation* undergoing minor repairs at the time of Delome's injury." *Id.* at 232 (emphasis added). The court noted that the barge had remained at the shipyard for only one week, and that the repairs undertaken were relatively inexpensive. Nevertheless, the court concluded that the barge owner owed Delome no duty of seaworthiness because Delome was not performing the kind of work that a seaman would traditionally perform. It is important to recognize that Delome's unseaworthiness claim was not foreclosed simply because his injuries took place while the barge was on land. Rather, Delome could not recover for unseaworthiness because he failed to demonstrate that he was doing seamen's work.

Bisso Marine calls the Court's attention to *Williams v. Avondale Shipyards, Inc.*, 452 F.2d 955 (5th Cir.1971); *Garret v. Dean Shank Drilling Co.*, 799 F.2d 1007 (5th Cir.1986); *Rogers v. M/V Ralph Bollinger*, 279 F.Supp. 92 (E.D.La.1968); and *Taylor v. Delta Seaboard Well Serv., Inc.*, 2002 WL 1204918 (E.D.La.2002), which generally define a vessel in navigation as a vessel "engaged as an instrument of commerce and transportation *on navigable waters*" or, in the case of a noncommercial vessel, one "engaged in her expected

duties as a vessel *on navigable waters.*" *Williams*, 452 F.2d at 958 (quoting Norris, Law of Seamen, § 664, p. 802) (emphasis added). These cases demonstrate that a newly constructed or extensively refurbished vessel cannot be in navigation if it has not yet entered or returned to maritime service. But these cases do not state that a vessel on land can never be in navigation. The vessel in each of these cases was on navigable waters at the time of the casualty; there was no need to address the issue Bisso Marine has raised.

The Court acknowledges that *Delome* declined to impose an "on navigable waters" situs requirement partly for pragmatic reasons that are inapplicable to this case. *Delome* explained that because courts had in some cases already applied the warranty of seaworthiness to a vessel in drydock, "any jurisdictional dichotomy between marine railways and other types of drydocks regarding the warranty of seaworthiness would be a fictional artifice, contrived to ensure conformity to a spatial boundary which is not really pertinent." *Delome*, 444 F.2d at 231. The Fifth Circuit saw no reason to deprive a *Sieracki* seaman of an unseaworthiness remedy merely because he happened to be working on marine railway instead of a floating drydock. *See id.* n. 10 (noting that marine railways had long been deemed "dry docks" for purposes of compensation under the LHWCA); *cf. Avondale Marine Ways, Inc. v. Henderson*, 346 U.S. 366, 367, 74 S.Ct. 100, 98 L.Ed. 77 (1953) (Burton, J., concurring) (describing a floating drydock, a graven drydock, and a marine railway and stating that each was a "dry

---

**2.** The status inquiry developed in *West* was originally meant to confine the *Sieracki* unseaworthiness remedy to those who actually did seamen's work on a ship engaged in maritime service. *Wagoner v. Sea–Land Service. Inc.*, 486 F.2d 955, 957–59 (5th Cir.1973). Courts today rely on the *West* factors to deter-

mine whether the vessel to which a putative seaman claims attachment is in navigation. *See Chandris, Inc. v. Latsis*, 515 U.S. 347, 373–75, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995) (explaining that a vessel may enter drydock and yet remain in navigation for purposes of the Jones Act).

dock" within the meaning of 33 U.S.C. § 903(a) as that section read before the 1972 Amendments).

But to adopt Bisso Marine's proposed vessel situs rule, the Court would have to dismiss *Delome* as an aberration. If the law absolutely required that a vessel in navigation be on navigable waters, surely the Fifth Circuit could not have dispensed with such a requirement merely by observing the functional similarity between a floating drydock and a marine railway. That court does not hesitate to recognize the divide between land and sea where it actually applies. *Boudloche v. Conoco Oil Corp.*, 615 F.2d 687 (5th Cir.1980) (per curiam). Given the absence of contradictory authority,[3] the Court must give effect to *Delome* and must reject Bisso Marine's *per se* situs rule.

▆▆▆ Bisso Marine does suggest in passing that it owed Carter no duty of seaworthiness because the BULLS EYE "was in the water only a few days in 2000." At this time, however, the Court is not apprized of the regularity with which the BULLS EYE took to the water.

▆▆▆ The "status of a ship" will determine whether it is "in navigation." *Roper v. United States*, 368 U.S. at 22–23, 82 S.Ct. 5 (1961). A vessel's status is primarily a question of fact. *Id.; Chandris, Inc. v. Latsis*, 515 U.S. 347, 373–75, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995). In its motion regarding Carter's unseaworthi-

ness claim, Bisso Marine states that over the course of the year 2000 the BULLS EYE spent only 12 days on the water doing survey work. Meanwhile, in its motion regarding Carter's seaman status, Bisso Marine contends that in 2000 Carter spent no more than 57 days aboard the BULLS EYE performing surveys.

For his part, Carter asserts that every time he used the BULLS EYE on a marine survey, he would perform some work on the vessel the day before the survey and the day after. The record does not make clear whether this preparatory work took place entirely on land, or whether it also occurred while the BULLS EYE was afloat. In addition, Carter testified at his deposition that occasionally Bisso Marine's diving department used the BULLS EYE. Thus, Carter was not the only employee to operate the BULLS EYE.

Considering the incomplete and even contradictory evidence before it, the Court cannot say as a matter of law that the BULLS EYE was out of navigation when Carter sustained his injuries. Bisso Marine's Motion for Partial Summary Judgment as to Plaintiff's Claim for Unseaworthiness must therefore be denied.

## D. Defendant's Motion as to Plaintiff's Accident of December 2000.

Finally, Bisso Marine contends that Carter cannot recover for his December 2000 injuries because at the time Carter was

**3.** Although disagreeing with its ultimate outcome, Judge Brown spoke approvingly of *Delome* in *Johnson v. Oil Transport Co.*, 445 F.2d 1402, 1402 (5th Cir.1971) (denial of rehearing) (Brown, C.J., dissenting). *Delome* was also recently cited in *Demette v. Falcon Drilling Co.*, 280 F.3d 492, 498 n. 18 (5th Cir. 2002) (noting that a vessel does not cease to be a vessel merely because it is not afloat on navigable waters):

"As long as a boat is able and intended to return to navigation, it remains a vessel,

even when in dry dock, storage on land, or otherwise removed from the water. *See* Thomas J. Schoenbaum, 1 Admiralty and Maritime Law 88–92 (West 2d ed.1994). This circuit has repeatedly rejected the notion that removing a vessel's hull from the water divests it of vessel status."

The parties here do not dispute that the BULLS EYE was a vessel when Carter was injured. Nevertheless, *Demette* confirms that a vessel's situs at the time of a casualty may not be truly indicative of its status.

not acting in the course of his employment. According to Bisso Marine, Carter's decision to haul the BULLS EYE to his home on Thursday, December 14, was a matter of personal convenience that in no way benefitted Bisso Marine. Bisso Marine further contends that Carter unhitched the trailer on Friday evening purely for his own benefit. Carter counters that taking the BULLS EYE home on Thursday actually did benefit Bisso Marine, and that his attempt to unhitch the trailer was made in the performance of company business.

A seaman may recover under the Jones Act only for an injury suffered "in the course of his employment." 46 U.S.C.App. § 688. The term "service of the ship," used to establish a seaman's entitlement to maintenance and cure, is equivalent to the term "course of employment" as used under the Jones Act. *Braen v. Pfeifer Oil Transp. Co.*, 361 U.S. 129, 132–33, 80 S.Ct. 247, 4 L.Ed.2d 191 (1959). One who is in the service of the ship is "generally answerable to its call to duty," but need not be "actually in performance of routine tasks or specific orders." *Farrell v. United States*, 336 U.S. 511, 516, 69 S.Ct. 707, 93 L.Ed. 850 (1949). The place of injury is not determinative. As long as his injury occurs in the course of his employment, a seaman may recover even for an injury sustained on land. *O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S. 36, 63 S.Ct. 488, 87 L.Ed. 596 (1943) (Jones Act); *Webb v. Dresser Industries*, 536 F.2d 603 (5th Cir.1976) (unseaworthiness); *Aguilar v. Standard Oil Co.*, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1943) (maintenance and cure).

With respect to seamen who regularly commute from home to vessel, the courts generally ask whether, at the time of the injury, there was "reciprocity of obligation." *Foret v. Co–Mar Offshore, Corp.*, 508 F.Supp. 980, 982 (E.D.La.1981).

The question is whether "the seaman was acting pursuant to some employer directive," or whether "the employer was a recipient of some benefit as a consequence of the seaman's shoreside activity." *Id.* This is a fact-intensive inquiry. *Baker v. Ocean Systems, Inc.*, 454 F.2d 379, 384 (5th Cir.1972). *See Vincent v. Harvey Well Service*, 441 F.2d 146 (5th Cir.1971) (seaman riding in an automobile from a remote dock to an inland assembly point was in the course of his employment; the vessel had no sleeping quarters; his employer furnished the vehicle as a matter of course and paid a fellow seaman to drive it); *Magnolia Towing Co. v. Pace*, 378 F.2d 12 (5th Cir.1967) (affirming verdict for a salaried seaman injured while traveling to his vessel as per his superior's orders in an automobile owned by his employer and driven by an on-duty coworker).

In *Sellers v. Dixilyn Corp.*, 433 F.2d 446 (5th Cir.1970), the court explained that a seaman injured ashore was entitled to maintenance and cure only if he was on authorized shore leave and answerable to the call of duty. *See also Daughdrill v. Diamond M. Drilling Co.*, 447 F.2d 781 (5th Cir.1971) (applying *Sellers* to a Jones Act claim). The seaman in *Daughdrill* was injured while returning to work, the seaman in *Sellers* while returning home for vacation. In each case the court found that the plaintiff, when injured, "was not serving any direct or indirect interest of his employer." *Sellers*, 433 F.2d at 448–49. During their off-time, the seamen were free to follow their own pursuits and had no obligation to return to work early, even if asked to. "[T]heir pay began and ended at the dock," and each "was responsible for his own transportation to and from home." *Daughdrill*, 447 F.2d at 784.

The crux of the current dispute is whether Carter was acting in the course of

his employment when he (1) drove the BULLS EYE to his home on Thursday and (2) unhitched the trailer from Bisso Marine's pick-up on Friday evening.

According to his deposition, Carter hauled the BULLS EYE home "[w]henever it was convenient." If Carter was scheduled to perform a survey in the same general direction as his home, he would customarily drive the BULLS EYE home to avoid having to backtrack to New Orleans on the day of the survey to retrieve it. On December 14, 2000, after obtaining permission from his superiors, Carter drove home in the company pick-up with the BULLS EYE in tow. Bisso Marine insists that Carter did this purely for his own convenience.

Carter testified that he was a salaried employee who remained on call 24 hours a day, seven days a week. He argues that taking the BULLS EYE home for the weekend saved gasoline and wear and tear on Bisso Marine's truck, and would have allowed him to begin his workday on Monday two hours later.[4] He also stated that his superior at Bisso Marine knew he would be spend Friday at home preparing the vessel for Monday's survey. Viewing the evidence in a light most favorable to Carter, the Court cannot conclude that Carter was, as a matter of law, acting outside the scope of his employment when he took the BULLS EYE home on December 14.

Bisso Marine next argues that Carter wanted to unhitch the trailer from Bisso Marine's truck on Friday evening so he could use the truck for personal errands. It relies on two exchanges from Carter's deposition:

Q: Now, why were you unhitching the trailer from the [truck]?

A: Because I didn't want to take the boat wherever I went for the weekend.

Q: Got you. So you essentially were unhooking the boat trailer from the truck so that the truck wouldn't be tied to the boat?

A: Right.

\*     \*     \*     \*     \*     \*

Q: Talking about the December 15th, 2000 accident, the one that happened on the Friday, were you going to work for—were you going to go into the office on Saturday or Sunday?

A: No, sir.

Q: Was there other work that you were going to do for Bisso Marine on Saturday or Sunday?

A: I don't recall any work.

In his opposition to summary judgment, Carter swears by affidavit that he did not use Bisso Marine's truck that weekend for personal errands. Carter says that he interpreted "work ... for Bisso Marine" to refer only to work on the BULLS EYE, such as the work he had done during the day on Friday. According to his affidavit, it was customary to buy gasoline and groceries for use during upcoming surveys. He states that he was unhitching the trailer so he could obtain these supplies in Bisso Marine's truck without having to maneuver with the BULLS EYE in tow.

Bisso Marine urges the Court to disregard Carter's affidavit because it contradicts his earlier deposition testimony. It is true that Carter cannot manufacture a genuine issue of material fact by submit-

---

4. Bisso Marine claims that Carter by departing directly from home would not have saved its customer in Mobile any money. However, Bisso Marine includes "travel time" as part of its survey fee.

ting an affidavit that directly contradicts his prior testimony. *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996). He may, however, supplement or explain his previous statements. *Clark v. Resistoflex Co.*, 854 F.2d 762, 766 (5th Cir.1988). He may "clarif[y] or amplif[y] the facts by giving greater detail or additional facts not previously provided in the deposition." *S.W.S. Erectors*, 72 F.3d at 496. What he may not do is "tell[ ] the same story differently." *Id.*

Here, Carter's affidavit and deposition testimony are not flatly inconsistent. "To the extent they exist, discrepancies in those averments present credibility issues properly put to the trier-of-fact. Credibility assessments are not fit grist for the summary judgment mill." *Dibidale v. American Bank & Trust Co.*, 916 F.2d 300, 307–08 (citation omitted). Although Carter's deposition testimony does suggest that he had no plans to undertake company business over the weekend, his affidavit offers a plausible explanation for his earlier statements. When Carter testified that he unhitched the trailer because he "didn't want to take the boat wherever [he] went for the weekend," counsel did not ask him where, if anywhere, he actually planned to go. Instead, the questioning shifted to other matters. It is at least possible, under those circumstances, to then construe "work . . . for Bisso Marine" in the narrow sense as Carter claims to have done. The Court is not convinced that Carter's affidavit is a sham to avert summary judgment.

Bisso Marine has also attached to its Reply Memorandum a credit card billing statement, dated December 2000. Bisso Marine furnished Carter a company credit card to use in fueling and provisioning the BULLS EYE. The credit card statement indicates that Carter purchased gasoline at a station in Hattiesburg, Mississippi on Saturday, December 16. Noting that Hattiesburg is 40 miles north of Poplarville,

Bisso Marine says the credit card statement proves that Carter unhitched the trailer on Friday evening solely to run personal errands in Bisso Marine's truck, and that he had no intention of purchasing fuel or groceries for the Mobile survey. According to Bisso Marine, if Carter were really buying gas for the BULLS EYE, he would have done so closer to his home in Poplarville.

The billing statement fails to establish that Carter would be free of all work-related duties over the weekend. Given Carter's sworn statement that he ran no personal errands in Bisso Marine's truck that weekend, the gasoline Carter purchased in Hattiesburg may well have been for use on the BULLS EYE or otherwise related to his employment obligations. Furthermore, the Hattiesburg purchase was made after Carter's injury. The Court's task is to determine whether Carter was acting in the course of his employment "at the time of his injury." *Braen*, 361 U.S. at 133, 80 S.Ct. 247. The circumstances surrounding Carter's gasoline purchase on Saturday may indeed be relevant to this determination, but the billing statement itself does not reveal why Carter attempted to unhitch the trailer on Friday evening, or where he intended to take Bisso Marine's truck. The true import of the Hattiesburg purchase is unclear, and the Court declines to draw the inference Bisso Marine proposes.

Because there remain issues of material fact as to whether Carter was acting in the scope of his employment on the evening of December 15, the Court must deny Bisso Marine's Motion as to Plaintiff's Accident of December 2000.

### E. Defendant's Motion for Partial Summary Judgment on Grounds of Statute of Limitations.

The final motion pending before this Court is a Motion for Partial Summary

Judgment on the plaintiff's claim for inadequate medical treatment. The claim for inadequate treatment arises out of incidents which occurred in 1992 and 1993. In his complaint, Carter alleges Bisso did not provide adequate and proper medical treatment for the lower back injuries he suffered in 1992 and 1993, and that these injuries contributed to the injuries he sustained in January and December of 2000. The defendant moves for summary judgment on this claims arguing that the plaintiff's action is prescribed. For the reasons that follow, this Court grants the defendant's Motion for Partial Summary Judgment.

Carter alleges that he initially injured his lower back in 1992 while lifting or dropping timber. *See* Carter Deposition, 82. Following 1992 injury, Carter visited the Fisher–Rabin Clinic and saw Dr. Levy, who discharged Mr. Carter without restrictions. In 1993, Carter claims that he injured his lower back again while lifting a cable eye and attempting to hook it on a derrick. *See* Carter Deposition, 85–86. After the 1993 injury, Carter saw a different doctor, Dr. Andrews, who discharged him without restrictions on December 20, 1993, subject to the stipulation that he work out at Human Performance Center. *See* Carter Deposition, 87. Throughout his treatment for the 1992 and 1993 injuries, Carter did not express any dissatisfaction with his doctors or the course of treatment they prescribed. *See* Carter at 85, 89.

For the period between 1994 through 1999, Carter saw Dr. Woessner, Dr. Andrews, and a chiropractor, Dr. Walker. Carter saw Dr. Andrews for another lower back injury that occurred in 1994, and saw Dr. Woessner and Dr. Walker for injuries to his neck which occurred in May of 1996 and in November of 1998. *See* Carter at 91–99. During this time, Carter became dissatisfied with Dr. Andrews and Dr. Woessner because none of the doctors discovered the source of his back problems. *See* Carter at 92, 94, 95.

Carter alleges that he did not become aware that he had been receiving inadequate treatment until he sought treatment with Dr. Hoffman for injuries occurring his later injuries on December 10, 1999. Carter suggests that he realized the inadequate treatment in January 25, 2000 when Dr. Bratton began treating the plaintiff in 2001. *See* Affidavit of Richard Carter, Plaintiff's Exhibit I.

In the defendant's motion for summary judgment, the defendant argues that the plaintiff's action is prescribed under two theories. Under the first theory, Bisso contends that 46 U.S.C.App. § 763a, the general statute of limitation for maritime torts, prescribes Carter's claim for improper medical treatment arising from the 1992 and 1993 injuries because the statute sets a three year time frame, within which all such claims must be brought.[5] Under Bisso's second theory, 46 U.S.C.App. § 183(g), the statute pertaining to a vessel owner's vicarious liability for medical malpractice, prescribes Carter's claim because the Court would have to apply the Louisiana one year statute of limitations for medical professionals.

Before the Court addresses these two prescription arguments, it will address the issue of the proper characterization of the plaintiff's claims. The defendant claims that this suit is a "medical malprac-

---

**5.** Section 763(a) states that "unless otherwise specified by law, a suit for recovery of damages for personal injury or death, or both, arising out of a maritime tort, shall not be maintained unless commenced within three years from the date the cause of action accrued." 46 U.S.C.App. § 763(a).

tice claim in sheep's clothing," while the plaintiff maintains that his lawsuit is an action for the direct negligence of his employer, Bisso, in failing to provide adequate medical treatment. No matter the label given to the claim, a vessel owner's duty to provide adequate medical treatment for its seaman is undisputed. *De Centeno v. Gulf Fleet Crews,* 798 F.2d 138, 140 (5th Cir.1986). A vessel owner can breach the duty to provide adequate medical care in two ways: 1) through its direct negligence in failing to provide prompt and qualified medical treatment for injured seamen and, 2) through the vessel owner's vicarious liability for the malpractice of the doctor it chooses. Direct negligence exists if the shipowner fails to provide doctors and prompt medical care. For example, in *Sambula v. Central Gulf Steamship Co.,* 268 F.Supp. 1 (S.D.Tex.1967), the court found that the ship was guilty of negligence in failing to provide proper medical treatment when it negligently selected a doctor to treat the plaintiff's injured eye. The plaintiff, a seaman, suffered a severe blow to the eye while on shore in Korea. *Id.* at 2. His employer took him to see a general practitioner who did not speak English. *Id.* The court held that the ship was negligent in its selection of the treating physician because not only was the doctor a general practitioner, but because he spoke no English and could not communicate with the plaintiff. *Id.* at 4. The court also found that plaintiff's eye injury was so severe that even a layman would have known that the plaintiff needed to see a specialist. *Id.* Further, the court found that the ship was negligent because it failed to take the plaintiff to a hospital or a specialist after he received the treatment of the general practitioner. *Id.*

This type of direct negligence, attributable to the ship owner is not what the plaintiff alleges. His cause of action stems from the alleged negligence of the doctors and therefore any liability of the employer is vicarious. As explained earlier, a cause of action for inadequate treatment can also derive from the negligence of the doctor. In *De Centeno v. Gulf Fleet Crews Inc.,* 798 F.2d 138, 140 (5th Cir.1986), the plaintiff, a seaman, was treated by the ship doctor, Dr. Turner, for influenza, but later died of diabetes. Dr. Chavarria, who diagnosed the plaintiff with diabetes shortly before his death testified that any competent doctor confronted with a patient who had the plaintiff's symptoms should have tested for diabetes. *Id.* The court found the ship vicariously liable for the negligence of Dr. Turner, the physician it chose to treat the plaintiff. *Id.*

■ In this case, the facts supporting the plaintiff's claim of inadequate medical treatment are derived from the alleged negligence of the physicians who treated Carter, not in its selection of treating physicians. In his complaint, the plaintiff alleges that "plaintiff sustained back injuries for which he was referred by his employer to the company's choice of physicians. In both instances, he was instructed to return to work without physical restrictions or limitations of any kind and without diagnostic testing of any kind." *See* Complaint, 2, ¶ VI. Carter presents no facts suggesting that Bisso was negligent in choosing the correct doctors or that Bisso was not prompt in providing treatment. In fact, Carter presents evidence showing that he chose his own physicians. Thus, Carter's allegation of inadequate medical treatment rests upon a vicarious liability theory, not on a theory of direct negligence on the part of the shipowner.

Because Carter's allegation is premised on vicarious liability, the applicable statute of limitations is 46 U.S.C.App. § 183(g), and § 763a is inapplicable.

■ According to 46 U.S.C.App. § 183(g),

> [i]n a suit by any person in which the operator or owner of a vessel or employer of a crewmember is claimed to have vicarious liability for medical malpractice with regard to a crewmember occurring at a shoreside facility, and to the extent that the damages resulted from the conduct of any shoreside doctor, hospital, medical facility, or other health care provider, such operator, owner, or employer shall be entitled to rely upon any and all statutory limitations of liability applicable to the doctor, hospital, medical facility, or other health care provider in the State of the United States in which the shoreside medical care was provided.

Under this statute the Court should apply La.Rev.Stat. 9:5628(A), the statute of limitations on actions for medical malpractice. This statute states that

> [n]o action for damages for injury or death against any physician chiropractor, dentist, psychologist, hospital duly licensed under the laws of this state, or community blood center ... whether based upon tort, or breach of contract, or otherwise arising out of patient care shall be brought unless filed within one year from the date of discovery of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect.

Under La.Rev.Stat. 9:5628(A), an action for medical malpractice is prescribed if it is not brought one year after the date of the act or omission, or one year after the discovery of the act or omission, but at the latest, three years from the date of the alleged acts or omissions.[6] In this case, Carter's actions prescribed on or about December 2, 1993 and or about December 17, 1994 for the 1992 and 1993 accidents which were treated on or about December 2, 1992 and or about December 17, 1993. Even if the Court applied the discovery rule to toll the limitations period until one year after the date of discovery of the acts or omissions, Carter would have had to bring his actions against Bisso, at the very latest, by 1996 and 1997 as a result of the three year preemptive period in the statute.

Carter has created no issue of material fact that would enable its claim for inadequate treatment to survive the defendant's Motion for Partial Summary Judgment. For the foregoing reasons, the Court grants defendant's motion for summary judgment as to the plaintiff's claim of inadequate treatment for the 1992 and 1993 accidents.

### CONCLUSION

At this juncture, the first three issues Bisso Marine presents cannot be decided as a matter of law. Accordingly,

**IT IS ORDERED** that Defendant Bisso Marine Company, Inc.'s Motion for Summary Judgment as to Plaintiff's Alleged Seaman Status (Doc. No. 41) is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant Bisso Marine Company, Inc.'s Motion for Partial Summary Judgment as to Plaintiff's Claim for Unseaworthiness (Doc. No. 26) is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant Bisso Marine Company, Inc.'s Motion as to Plaintiff's Accident of December 2000 (Doc. No. 22) is **DENIED.**

---

**6.** *See* Plaintiff's Exhibits C and E.

**IT IS FURTHER ORDERED** that Defendant Bisso Marine Company, Inc.'s Motion For Partial Summary Judgment on Grounds of Statute of Limitations (Doc. No. 25) is **GRANTED.**